**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 22-4309**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

ROBERT JAMES MCCABE,

Defendant – Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk.  Arenda L. Wright Allen, District Judge.  (2:19-cr-00171-AWA-DEM-1)

Argued:  October 25, 2023                    Decided:  June 3, 2024

Before KING and GREGORY, Circuit Judges, and Joseph R. GOODWIN, United States District Judge for the Southern District of West Virginia, sitting by designation.

Affirmed by published opinion.  Judge King wrote the opinion, in which Judge Gregory and Judge Goodwin joined.

**ARGUED:**  Laura Pellatiro Tayman, LAURA P. TAYMAN, PLLC, Newport News, Virginia, for Appellant.  Richard Daniel Cooke, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.  **ON BRIEF:**  Jessica D. Aber, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia; Jacqueline R. Bechara, Assistant United States Attorney, OFFICE OF THE UNITED

STATES ATTORNEY, Alexandria, Virginia; Anthony Mozzi, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.

————————

KING, Circuit Judge:

Former Sheriff Robert James McCabe of the City of Norfolk, Virginia, appeals from his convictions and related sentences for carrying out wide-ranging fraud and bribery schemes with contractors concerning medical and food services for prisoners in the Norfolk Jail. For more than 20 years, McCabe assisted favored contractors by providing them with inside information about competing bids for the Jail's contracts, as well as unilaterally altering and extending contracts for the benefit of those contractors. In exchange, McCabe received various things of substantial value, including campaign contributions, sums of cash, and a stream of so-called "gifts." Indicted in 2019 in the Eastern District of Virginia with the CEO of a jail contractor — that is, Gerard Francis Boyle — McCabe was tried alone by a jury in Norfolk in 2021. McCabe was convicted of 11 federal offenses, including charges of conspiracy, honest services mail fraud, Hobbs Act extortion, and money laundering. In May 2022, McCabe was sentenced to 144 months in prison, plus supervised release.

On appeal, Sheriff McCabe pursues four contentions of error arising from his convictions and sentences. First, he presents a trial sequence issue, maintaining that his trial was erroneously unfair because it was conducted before a trial of codefendant Boyle. Second, McCabe contends that the trial court fatally erred by admitting hearsay statements made by a so-called "Undersheriff." Third, McCabe contests jury instructions of the trial court. That is, relying primarily on the Supreme Court's decisions in *McCormick v. United States*, 500 U.S. 257 (1991), and in *McDonnell v. United States*, 579 U.S. 550 (2016), McCabe disputes certain of the court's instructions pertaining to bribery which, according

3

to McCabe, fatally undermine each of his convictions. Finally, McCabe challenges the court's application of an 18-level sentencing enhancement.

As explained herein, we are satisfied that each of Sheriff McCabe's appellate contentions lacks merit, and we affirm his convictions and sentences.

## I.

Before reviewing and assessing the legal issues presented, we will summarize the pertinent facts underlying those issues. The pertinent facts and reasonable inferences drawn therefrom are recited in the light most favorable to the Government, as the prevailing party at trial. *See United States v. Burgos*, 94 F.3d 849, 854 (4th Cir. 1996).

## A.

In 1993, defendant McCabe was elected Sheriff of the City of Norfolk. He served in that capacity from 1994 through 2017. Under Virginia law, a Sheriff is "charged with the custody, feeding and care of all prisoners confined in the county or city jail." *See* Va. Code Ann. § 15.2-1609. As the Sheriff of Norfolk, McCabe exercised broad discretion over the Jail's contracts providing, among other things, medical care and food services for prisoners. More specifically, McCabe was involved with and responsible for, inter alia, contract negotiations, renewals, and extensions. The primary constraint on Sheriff

4

McCabe's discretion over Jail contracts was a competitive bidding process, which involved the City of Norfolk's issuance of "Requests for Proposals," also known as "RFPs."[1]

During his extended tenure as Sheriff of Norfolk, McCabe maintained and carried out corrupt relationships with at least two major jail contractors. One of them, ABL Management, Inc. ("ABL"), was the City's primary provider of food services for Jail prisoners from 1994 until 2017.[2] John Appleton was ABL's CEO, and Appleton became a cooperating unindicted coconspirator and witness for the prosecution. The second major contractor — named Correct Care Solutions, LLC ("CCS") — provided medical services for Jail prisoners, and it was operated by coconspirator and codefendant Boyle, its founder and CEO.[3]

Relevant here, Sheriff McCabe assisted ABL and CCS in three corrupt ways: (1) he ensured that ABL and CCS could obtain lucrative Jail services contracts — paid for by the City — by providing Appleton and Boyle with important inside information that

---

[1] During the relevant period, ethics rules were in place with respect to the RFP process of the City of Norfolk, in order to ensure a level playing field between entities seeking and bidding for the Jail's medical and food business. The RFP process prohibited communications about the contract proposals between the bidders and City employees who were not members of a committee designated to receive and evaluate bid proposals. Sheriff McCabe was never a member of the City's bid evaluation committee.

[2] Although ABL was the primary provider of food services for the Jail during nearly all of Sheriff McCabe's tenure as the Sheriff of Norfolk, ABL lost the bid in 1999, and thus did not provide food services for that one year.

[3] Our references to Appleton and Boyle refer equally to ABL and CCS, respectively. That is, references herein to Appleton mean ABL, and vice versa. And references to Boyle mean CCS, and vice versa.

5

enabled them to undercut other bidders in the City's competitive bidding processes; (2) McCabe exercised his authority to modify terms of the Jail's medical and food services contracts to financially benefit ABL and CCS — and thus also benefit Appleton and Boyle — without corresponding benefits for the City; and (3) McCabe unilaterally extended Jail contracts and thereby allowed ABL and CCS to avoid the competitive bidding process. In exchange for the foregoing, McCabe routinely expected and received substantial benefits from ABL and CCS, including, inter alia, campaign contributions, free catering of McCabe's personal events, fully-expensed travel, entertainment expenses, cash payments, gift cards, and other valuable benefits.

1.

a.

The various benefits provided to Sheriff McCabe by Appleton and ABL began in about 1994, when ABL received a one-year emergency services contract to provide food for the Norfolk Jail. Shortly before the emergency contract was to expire in 1995, the City issued an RFP for bids from potential food service vendors. Seeking to continue its business of providing food services for the Jail, ABL submitted a bid proposal in 1995 to the City and its evaluation committee.

After ABL's 1995 food services proposal was submitted, Sheriff McCabe met with Appleton in McCabe's office. During their meeting, McCabe advised Appleton that something of "interest" had been left for Appleton on McCabe's desk. *See* J.A. 1560.[4]

---

[4] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

6

McCabe then left his office, and Appleton looked on the desk. Appleton found that the something of "interest" placed there for him by McCabe was a major competitor's bid sheet. Appleton then used the competitor's bid sheet to modify ABL's bid proposal, undercutting the competition and ensuring that ABL would obtain the Jail's 1995 food services contract. That contract — worth approximately 1.3 million dollars — was only for a single year, but it gave McCabe the right to renew for two additional years.

b.

Sheriff McCabe and Appleton continued their illicit relationship through at least 2016, that is, for a period of more than 20 years. Even though there were other bidders for the Jail's food services contract during that period, McCabe consistently favored Appleton and ensured that ABL would continue as the food contractor for the Norfolk Jail. In return, Appleton provided McCabe with numerous benefits of substantial value. For example, following the Jail's emergency food contract being awarded to ABL in 1994, and the City's subsequent award to ABL of the renewable 1995 contract, Appleton did the following, inter alia, for McCabe:

- Routinely provided free continental breakfasts and lunches for McCabe and his employees;

- Provided and paid for catering of a Christmas party at McCabe's home, with about 100 attendees, in December 1998;

- Paid for and escorted McCabe to a "Black Tie" party in New Orleans during Mardi Gras;

- Paid McCabe's travel expenses for a trip to San Francisco, including a tour of Alcatraz Island and a flight in a glass-bottom helicopter; and

7

- Provided complimentary catering of food and drinks for annual golf tournaments — from 2000 to 2016 — hosted by McCabe.

In 2003, when Sheriff McCabe could no longer unilaterally extend the Jail's food contract with ABL, the City issued a new RFP for the Jail's food services. Unsurprisingly, Sheriff McCabe caused the 2003 contract to be awarded to ABL. And in 2004, McCabe exercised his discretionary authority to renew ABL's Jail contract. Thereafter, McCabe assisted ABL in other ways by making the Jail's food contract more profitable. For example, when McCabe extended the Jail's food contract in June 2005, it was revised to include a 3.1% increase in the price per meal. Between 2006 and 2008, Sheriff McCabe re-awarded and extended ABL's food contract, and he also increased the price per meal two more times.

During the period when ABL was receiving those lucrative contract terms from Sheriff McCabe, Appleton provided McCabe with tickets to the 2004 college football National Championship game in New Orleans. Appleton also paid for McCabe's associated travel expenses to the big football game. At no cost to McCabe, Appleton catered about $1500 worth of food for a Sheriff's Association function in 2006, and ABL provided food worth at least $600 for a 2006 Christmas party at McCabe's home.

From 2009 to 2016, Sheriff McCabe unilaterally renewed the Jail's food contract with ABL at least five times. McCabe also continued to make the Jail's food contracts more lucrative for ABL, increasing the price per meal on at least three more occasions. McCabe supported ABL's expenses by having his office budget reimburse the salary of an ABL employee, who had been hired to assist in preparation of the Jail's food. *See* J.A.

1830. During that same period, McCabe received around $5000 of campaign donations through Appleton, plus an additional $3500 worth of food and related catering services for multiple events hosted by McCabe.

## 2.

Turning next to the Jail's medical services contracts with CCS, the trial evidence proved an extensive and continuing corrupt relationship between Sheriff McCabe and codefendant Boyle. That relationship began in 2004 and was even more egregious than McCabe's relationship with Appleton and ABL concerning the Jail's food services.

## a.

In pursuit of a contract for the Jail's medical services, Boyle showered Sheriff McCabe with various things of substantial value. In January 2004, for example, McCabe and Boyle attended a conference together in New Orleans. During their trip, Boyle gave McCabe — who had lost a lot of money gambling — a "fistful" of gambling chips for his use at Harrah's Casino. The next morning, McCabe cashed in about $10,000 worth of gambling chips. Boyle also treated McCabe and other employees of the Sheriff to dinner at an expensive New Orleans steakhouse, where they discussed the upcoming RFP for the Jail's medical services contract.

On March 16, 2004, the City of Norfolk issued its RFP for the Jail's medical services contract. Two weeks later, Sheriff McCabe hosted a public meeting with interested bidders, which Boyle attended. Immediately prior to the public meeting, however, McCabe met privately with Boyle. McCabe and Boyle concealed their private meeting from the

9

other bidders and walked into the public bidders meeting separately. They then pretended they were not even acquainted.

Throughout the next couple of months, Sheriff McCabe and Boyle continued to meet and discuss the 2004 RFP and the Jail's medical services contract. At various points, McCabe directed certain of his employees, including a former Undersheriff named Koceja, to provide Boyle with inside information regarding competitors' bids for the contract. Equipped with confidential inside information, Boyle then met with McCabe for closed-door negotiations, culminating in a "deal" with Boyle on the Jail's medical services contract. The following day, Boyle and CCS sent a letter to McCabe, revising CCS's bid proposal in a manner consistent with their secret backchannel "deal."

When the RFP process concluded in June 2004, Sheriff McCabe secured a multi-year contract with CCS — on behalf of the City of Norfolk — for the Jail's medical services. Pursuant thereto, the City agreed to pay 3.11 million dollars to CCS for 2004, plus 3.24 million dollars to CCS for 2005. The 2004 contract with CCS gave McCabe the sole discretion to extend it for a third year. And McCabe did so, resulting in an additional 3.37 million dollar payment to CCS in 2006.

b.

After Sheriff McCabe and Boyle began their corrupt relationship in about 2004, it continued through 2016. During that period, McCabe solicited and received multiple valuable benefits from Boyle, including a stream of cash payments, campaign donations, clothing, travel expenses, and tickets to multiple concerts and sporting events.

10

Significant inculpatory evidence was presented by the prosecutors concerning the City's 2009 RFP for the Jail's medical services contract. In October 2008, Boyle wrote to a man named Jim Sohr, a CCS investor, explaining that Sheriff McCabe had advised Boyle that "it would be cool" if Boyle could secure political donations to support McCabe's re-election campaign for Sheriff. *See* J.A. 8596. Boyle explained that he was writing at McCabe's request, emphasizing to Sohr that CCS's "contract [for the Jail's medical services in 2009] is out to bid in January for a July renewal." *Id.* When McCabe received a $3000 donation from Sohr in 2009, McCabe had the City's 2009 medical services RFP postponed for a year, that is, until 2010, effectively awarding CCS an extra year as the Jail's medical services provider.

When the City issued its RFP for the Jail's medical services contract in 2010, Sheriff McCabe alerted Boyle by private email that a new competitor, named "Prime Care," would likely be the low bidder on the 2010 contract. In response to that inside information, CCS lowered its bid by about $200,000, narrowly making CCS the successful low bidder. At trial, a CCS employee confirmed that CCS's reduced bid was due solely to McCabe having provided inside information to CCS about Prime Care and other bidders. As a result, CCS was awarded the 2010 Jail medical services contract. Shortly thereafter, in 2011, Boyle and CCS gave McCabe approximately $37,000, plus another $7500 campaign donation.

And CCS also paid McCabe's expenses for a 2011 golf trip to Palm Springs, California, as well as a trip in November of that year to a casino in Arizona.[5]

c.

In 2016, Sheriff McCabe was a candidate for Mayor of Norfolk. In support of that effort, Boyle presented McCabe a personal $12,500 check, dated April 25, 2016. The "memo" line on the check falsely specified that it was for "Consulting." *See* J.A. 10761. The inculpatory $12,500 personal check was signed by Boyle, with the "Pay to" line left blank. When introduced into evidence, however, Boyle's $12,500 check was payable to a man named "James E. Baylor." Baylor is "Conspirator #2" in the Indictment, and he was a friend of Sheriff McCabe. Baylor's identity as a coconspirator and as the source of the "Baylor Money" was confirmed at trial, when Baylor testified for the prosecution. The Baylor Money escapade was introduced by the prosecution as further support for the corrupt intentions of McCabe and his coconspirators in a mail fraud conspiracy and a money laundering conspiracy.

The reason for the blank "Pay to" line, as Baylor confirmed at trial, was that Boyle did not want to publicly reveal his large contribution to Sheriff McCabe's 2016 campaign for Mayor of Norfolk. At McCabe's direction, Baylor wrote his own name on the "Pay to" line of the $12,500 check and deposited it into Baylor's own personal bank account. Baylor

---

[5] Of the $37,000 that Boyle and CCS gave McCabe, Boyle first handed McCabe $6000 in cash in Philadelphia in October 2011. The other $31,000 was later given to McCabe by Boyle on their 2011 trip to Arizona. This larger payment was proved by one of the Sheriff's employees, who confirmed that after McCabe returned from the Arizona trip, the employee saw McCabe in his home with stacks of cash, which McCabe acknowledged being $31,000.

12

then used the Baylor Money as follows: Baylor had three of his business associates send "straw donor" checks — one for $3000 and two for $1500 each — to McCabe's campaign for Mayor. Using $6000 of the Baylor Money, Baylor reimbursed each of those three straw donors for their phony campaign donations to McCabe. After one of Baylor's own business entities wrote another $1500 straw donor check to McCabe's campaign, Baylor also reimbursed that $1500 payment from the Baylor Money. As a result, at least $7500 of the Baylor Money was used to fund fraudulent campaign contributions to McCabe's campaign for Mayor. The apparent remaining sum of $5000 of the Baylor Money is not accounted for in the trial record.[6]

3.

The prosecution's evidence also proved that Sheriff McCabe failed to publicly disclose any of the payments and benefits he had received from Appleton and Boyle, as

---

[6] In Baylor's trial testimony, his handling of the Baylor Money and the missing $5000 were sought to be explained as follows:

Defense counsel: Okay, so let's talk about this $12,500 check.

Baylor: Okay. . . .

Defense counsel: So you then took the check, and you described exactly what you did with it. The way I counted it up — and correct me if I'm wrong — there were four separate checks that were then written out, which you reimbursed; a $3,000 check and three $1,500 checks. So my math would be that's $7,500. Do you know what happened to the other 5,000 [dollars]?

Baylor: There were other checks I gave the government for reconciliation.

*See* J.A. 2455.

13

required by the law of Virginia. *See* Va. Code Ann. § 2.2-3116. The law required the Sheriff to file an annual disclosure statement, detailing his personal economic interests. Each disclosure statement, called a Statement of Economic Interests ("SOEI"), was required by the Commonwealth to identify annually, inter alia, gifts and entertainment valued in excess of $50 and given to Virginia officials. Although McCabe filed his SOEI disclosure each year, he failed to disclose any of the payments and benefits he received from Appleton and Boyle, or from ABL and CCS. Those payments and benefits were thus concealed from the public.

As a candidate for Sheriff and Mayor, McCabe was also required under Virginia law to file financial disclosure reports identifying campaign contributions and expenditures. *See* Va. Code Ann. § 24.2-947.4. McCabe filed those disclosure reports from 2010 through 2016, but his reports failed to identify any campaign contributions made by Appleton and Boyle — or their businesses — for McCabe's re-election campaign, or for his campaign for Mayor of Norfolk.

* * *

The prosecution established beyond a reasonable doubt that Appleton and Boyle — along with ABL and CCS — supported Sheriff McCabe with an extensive stream of valuable benefits over a period of more than 20 years, totalling at least $261,000, in various forms. Those benefits included multiple cash payments, campaign donations, event tickets, expenses for food, trips, and golf tournaments, plus catering costs for parties and events hosted by McCabe. And McCabe failed to disclose those and other valuable and illegal benefits, in violation of Virginia law. In exchange for the benefits received, McCabe, as

14

explained above, consistently awarded ABL and CCS the contracts with the Jail, extended the contracts when he had the discretion to do so, and modified the terms of the contracts for the benefit of ABL and CCS.

B.

1.

On October 24, 2019, the federal grand jury in Norfolk indicted Sheriff McCabe and coconspirator Boyle. The Indictment alleged, inter alia, that from 1994 to 2016 McCabe and Boyle, as codefendants and coconspirators, plus Conspirators #1 and #2 and other unnamed coconspirators, engaged in multiple fraud and bribery schemes. In carrying out those schemes, McCabe was alleged to have

> used his official position . . . to enrich himself by soliciting things of value including, but not limited to, gifts, food, cash, travel, entertainment, campaign contributions, in-kind political donations and other things of value.

See J.A. 32. The Indictment detailed McCabe's relationships with Appleton and Boyle and their respective business entities. McCabe was indicted for the following 11 offenses:

- Two counts of conspiracy to commit honest services mail fraud (Counts One and Two), in violation of 18 U.S.C. §§ 1341, 1346, and 1349;

- Five counts of honest services mail fraud (Counts Three through Seven), in violation of 18 U.S.C. §§ 1341, 1346, and 2;

- Two counts of conspiracy to commit Hobbs Act extortion (Counts Eight and Nine), in violation of 18 U.S.C. § 1951;

- One count of Hobbs Act extortion (Count Ten), in violation of 18 U.S.C. § 1951; and

- One count of conspiracy to commit money laundering (Count Eleven), in violation of 18 U.S.C. § 1956(h).

15

For his part, Boyle was indicted as a codefendant with McCabe in six counts of the Indictment, that is, Counts Two, Five through Seven, Nine, and Eleven.

2.

Following the return of the Indictment in 2019, Sheriff McCabe and Boyle filed a series of pretrial motions. In particular, McCabe requested the district court to dismiss the Indictment against him for failure to allege a quid pro quo, and he separately moved for dismissal of the money laundering offense in Count Eleven. Boyle filed, inter alia, a motion to sever his trial from that of Sheriff McCabe. On March 19, 2020, the district court entered a comprehensive Order (the "Pretrial Opinion") addressing several of the pretrial motions. The Pretrial Opinion denied McCabe's motion to dismiss the Indictment for failure to allege a quid pro quo. In so ruling, the court thoroughly reviewed and assessed the elements of "honest services mail fraud," under § 1341 of Title 18,[7] and "extortion" under the Hobbs Act, that is, § 1951 of Title 18.[8]

---

[7] The mail fraud statute, codified in 18 U.S.C. § 1341, criminalizes "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses" using the Postal Service or any "authorized depository" for mail matter. Section 1341 cross-references 18 U.S.C. § 1346, which further defines the term "scheme or artifice to defraud" to "include[] a scheme or artifice to deprive another of the intangible right of honest services."

[8] Section 1951 of Title 18, commonly known as the "Hobbs Act," prohibits extortion offenses that affect interstate or foreign commerce, as well as attempts or conspiracies to do so. Extortion, as used in the Hobbs Act, includes the offense of bribery. *See Evans v. United States*, 504 U.S. 225, 260 (1992) (recognizing that Hobbs Act extortion by a public official is the "rough equivalent" of "taking a bribe").

Specific to McCabe's and Boyle's prosecutions, an element of each of those offenses is a bribery scheme, which requires proof of a "quid pro quo." In discussing the quid pro quo requirement of a bribery scheme that does not involve a campaign contribution, the Pretrial Opinion carefully assessed the Supreme Court's 2016 decision in *McDonnell v. United States*, 579 U.S. 550 (2016). Applying *McDonnell*, the district court recognized that, to prove the quid pro quo of bribery, "the Government must prove that Defendant McCabe committed (or agreed to commit) an 'official act' in exchange for the loans and gifts." *See* Pretrial Opinion 12.[9] Pursuant thereto, the court ruled that the Indictment sufficiently alleged quid pro quo corruption between Sheriff McCabe and his coconspirators — including Appleton and Boyle.

By its Pretrial Opinion, the district court also denied Sheriff McCabe's motion to dismiss the money laundering charge in Count Eleven for failure to allege an explicit quid pro quo with respect to the campaign contributions tied to the Baylor Money.[10] The court ruled that Count Eleven sufficiently alleged an "explicit" quid pro quo as to McCabe, relying on the Supreme Court's 1991 decision in *McCormick v. United States*, 500 U.S. 257 (1991). The *McCormick* Court established that the proper analysis of a quid pro quo

---

[9] The Pretrial Opinion recited that, in evaluating the Hobbs Act allegations of the Indictment, the "parties appear to agree that bribery should be defined as it was defined in *McDonnell v. United States*." *See* Pretrial Opinion 12. In *McDonnell*, the Supreme Court relied on the federal bribery statute, codified at 18 U.S.C. § 201, for its definition of bribery. *See* 579 U.S. at 562.

[10] Defendant Boyle also moved to dismiss Count Eleven, asserting that it failed to sufficiently allege a money laundering conspiracy against him. The district court agreed, and dismissed Count Eleven as to Boyle only.

issue when campaign contributions are involved is distinct from that of a typical bribery scheme. As the Court explained, the receipt of political contributions can establish bribery only when the Government proves an "explicit" quid pro quo — that is, a quid pro quo where "the payments are made in return for an explicit promise or undertaking by the official to perform or not perform an official act." *See McCormick*, 500 U.S. at 273. Applying *McCormick*, the Pretrial Opinion ruled that Count Eleven sufficiently alleged an "explicit" quid pro quo in charging McCabe with money laundering.

The Pretrial Opinion then addressed Boyle's severance motion, ruling that Sheriff McCabe and Boyle were improperly joined in the Indictment, due to the five charges lodged solely against McCabe. The court, however, deferred ruling on how its severance decision would impact the trials of McCabe and Boyle. The court thus requested further briefing on how the trials should be conducted — that is, whether McCabe and Boyle should be tried jointly on the common charges, or whether they should be tried separately.

About a month later, in April 2020, the district court entered a follow-up Order and granted a severance of trials to Sheriff McCabe and codefendant Boyle (the "Trial Sequence Order"). The court also ruled therein that McCabe's trial would be conducted first, and that Boyle would be tried thereafter. The court's trial sequence ruling — i.e., that McCabe would be tried first — was mainly due to McCabe being the primary defendant in the Indictment. The Trial Sequence Order also discussed our decision in *United States v. Parodi,* 703 F.2d 768 (4th Cir. 1983), where Judge Russell identified four factors that a trial court should consider in resolving a severance issue. To the extent *Parodi* applied, the trial court concluded that it weighed in favor of McCabe being tried first. The court

18

also emphasized that considerations of efficiency and the "ends of justice" supported McCabe being tried first, before a trial of Boyle. *See* Trial Sequence Order 4; *see also* J.A. 313, 322, 330, 338 (explaining several subsequent trial continuances, the court relied on its Trial Sequence Order and its finding that the "ends of justice" were best served by McCabe being tried first).

C.

Sheriff McCabe's jury trial began in Norfolk on August 3, 2021, and the trial proceedings lasted about three weeks. The prosecution presented extensive testimonial and documentary evidence in its case-in-chief, including nearly 30 witnesses, plus more than 650 exhibits. The Government's evidence detailed the fraud and bribery schemes conceived and carried out by McCabe, Appleton, Boyle, and their businesses, establishing McCabe's intimate role in the corrupt activities surrounding the City's awards of contracts for food and medical services at the Norfolk Jail. For his part, McCabe presented what can be fairly characterized as a robust defense — calling several witnesses and testifying at length on his own behalf.

1.

In the prosecution's case-in-chief, two of the witnesses were Virginia Rader and Paul Ballance, who had been employees of Sheriff McCabe during his tenure in office. Rader and Ballance were called to testify about out-of-court statements made to them by one of McCabe's so-called Undersheriffs, a man named Norman Hughey. Hughey had died before McCabe's trial began. According to Rader and Ballance, Hughey had revealed to each of them, when they worked together for the Sheriff, that he (Hughey) was instructed

by McCabe to provide Boyle with confidential inside information about the bidding competitors' various bids for the Jail's medical services contracts (the "Hughey Statements").

Rader began working for Sheriff McCabe as a classification officer in February 1999, and she was still employed by the City when she testified. When the prosecutors indicated at trial that Rader would be testifying about the Hughey Statements, the defense objected on multiple grounds, including hearsay. More specifically, McCabe challenged the admission of the Hughey Statements under Rule 801(d)(2)(D) of the Federal Rules of Evidence. Although McCabe's hearsay objection to the Hughey Statements was initially sustained by the trial court, the prosecutors requested the court to reconsider its ruling.

In support of its reconsideration request, the prosecution presented further details of interviews with Hughey, Rader, and Ballance. The district court then secured additional briefing on the admissibility question. In his supplemental brief on the issue, Sheriff McCabe presented — in addition to Rule 801(d)(2)(D) — challenges predicated on Rule 403 of the Federal Rules of Evidence and the Sixth Amendment's Confrontation Clause. The court then considered and rejected all three of those challenges in a mid-trial Order (the "Evidence Ruling"). The testimony of Rader and Ballance regarding the Hughey Statements was thus admitted into evidence.

In Rader's testimony, she confirmed that the Hughey Statements had been made. Rader said that Hughey was a member of the City's evaluation committee in 2010 for the RFP involving medical services for prisoners at the Norfolk Jail. In that regard, Sheriff McCabe had instructed Hughey to call Boyle and inform him about confidential competing

20

bids on the 2010 RFP. Hughey, however, told Rader that he had refused to pass that confidential bidding information along to CCS.

Ballance's testimony about the Hughey Statements was consistent with and corroborated Rader's testimony. Ballance worked for the City from 2003 to 2018 and was a fire safety coordinator. Ballance confirmed that, in 2010, Hughey was a member of the City's evaluation committee for the Jail's medical services contract. Hughey had expressed concerns to Ballance regarding the 2010 bid process. According to Ballance, Sheriff McCabe told Hughey to call Boyle and advise him of details of the confidential competing bids so that CCS could reduce its bid and win the Jail's medical services contract. Hughey did not carry out McCabe's request.

2.

On August 23, 2021 — the fourteenth day of trial — the district court finalized its jury instructions in a charge conference that the court conducted with defense counsel and the prosecutors. During that conference, the court reviewed its intended instructions, providing each party an opportunity to object to and seek to alter or strike any of the proposed instructions. Of importance, defense counsel failed to make any objections to the instructions that Sheriff McCabe now contests on appeal. Consistent with the results of the charge conference, the court presented its instructions to the jury. The trial concluded on August 24, 2021, and the jury verdict found McCabe guilty on all 11 counts.

3.

On May 20, 2022, the district court conducted its sentencing hearing with respect to Sheriff McCabe. During the sentencing proceedings, McCabe objected to an 18-level

21

sentencing enhancement recommended by the Presentence Report (the "PSR"), which was predicated on the amount of loss attributed to his criminal conduct. More specifically, McCabe argued that the determination of the amount of loss should have been limited to the value of the benefits that flowed to him personally ($261,000), as opposed to the net profits that ABL and CCS made in performing their respective Jail contracts for the City ($5.2 million).

The district court overruled Sheriff McCabe's objection to the 18-level enhancement, ruling that a sentencing court is entitled to calculate the amount of loss by ascertaining "the value of anything obtained or to be obtained by a public official or others acting with a public official." *See* USSG § 2C1.1(b)(2). Relying on our precedent that has sustained upward adjustments based on the value of the profits received by the payor in exchange for a bribe — rather than upon the value of the bribe itself — the sentencing court applied the 18-level enhancement recommended by the PSR to McCabe's base offense level of 14. The resulting 18-level enhancement, along with other enhancements, resulted in McCabe's total offense level of 43. Based on the applicable Guidelines, an offense level of 43 warrants a sentence of up to life in prison. *Id.* § 5A. Consistent with the statutory maximum penalty of 20 years on each of his 11 charges, the PSR recommended that McCabe be sentenced to 240 months on each conviction.

The district court accorded Sheriff McCabe a substantial downward departure from the PSR recommendation and sentenced him to 144 months in prison on each conviction,

22

plus three years of supervised release, to run concurrently. McCabe has timely appealed his convictions and sentences, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.[11]

II.

Sheriff McCabe presents four contentions of error on appeal. First, he presents his trial sequence issue, maintaining that his trial was erroneously unfair because it was conducted before a trial of codefendant Boyle. Second, McCabe contends that the trial court fatally erred by admitting the Hughey Statements into evidence. Third, McCabe contests several jury instructions of the trial court. That is, relying primarily on the Supreme Court's decisions in *McCormick v. United States*, 500 U.S. 257 (1991), and in *McDonnell v. United States*, 579 U.S. 550 (2016), McCabe disputes certain of the court's instructions pertaining to bribery which, according to McCabe, fatally undermine each of his convictions. Finally, McCabe challenges the court's application of an 18-level sentencing enhancement. We will address and resolve each of Sheriff McCabe's appellate claims.

---

[11] Sheriff McCabe was the only defendant named in the Indictment who was tried and convicted. Codefendant Boyle was not tried, but entered into a plea agreement with the United States Attorney. Boyle later pleaded guilty to a one-count Information, charging a violation of 18 U.S.C. § 371, that is, conspiracy to commit an offense against the United States. Boyle did not testify in Sheriff McCabe's trial and was ultimately sentenced to 36 months in prison, plus three years of supervised release. Coconspirator Appleton, referred to in the Indictment as "Conspirator #1," testified against Sheriff McCabe and was not charged. Similarly, coconspirator Baylor, referred to in the Indictment as "Conspirator #2," also testified against McCabe and was not charged.

23

A.

We first address Sheriff McCabe's contention of error concerning the district court's trial sequence ruling. In that regard, it is settled that we review a trial court's decisions on scheduling for abuse of discretion. *See Morris v. Slappy*, 461 U.S. 1, 11 (1983) ("Trial judges necessarily require a great deal of latitude in scheduling trials.").

1.

Sheriff McCabe maintains that the district court abused its discretion by scheduling his trial to be conducted before the trial of codefendant Boyle. Although McCabe acknowledges that a trial court's decision to "sever a case and [its] corresponding decisions about the order of severed cases" are generally reviewed for abuse of discretion, he contends that, in his situation, defendant Boyle should have been — as a matter of law — tried first. *See* Br. of Appellant 85. And McCabe emphasizes that a court "abuses its discretion when it makes an error of law." *Id.* (quoting *United States v. Ebersole*, 411 F.3d 517, 526 (4th Cir. 2005)).

In support, Sheriff McCabe contends that he was prejudiced because the trial sequence established by the district court "required [McCabe] to proceed to trial first [and denied] him access to essential exculpatory evidence." *See* Br. of Appellant 85. More specifically, McCabe argues that coconspirator and codefendant Boyle would have testified favorably to McCabe if a joint trial had been conducted.

2.

Although our Court has not directly resolved an appellate challenge to a trial sequence issue such as that presented here, several of our sister circuits have done so. And

24

each of them has applied a deferential standard of review to such rulings, that is, an abuse of discretion review. *See, e.g.*, *Taylor v. Singletary*, 122 F.3d 1390, 1392 (11th Cir. 1997) ("It is well-settled that it is within the trial judge's sound discretion to set the order in which codefendants will be tried."); *United States v. Poston*, 902 F.2d 90, 97 (D.C. Cir. 1990); *Byrd v. Wainwright*, 428 F.2d 1017, 1022 (5th Cir. 1970). Additionally, several of the courts of appeals have ruled that a severed codefendant has no right to be tried in a particular order or sequence. *See United States v. DiBernardo*, 880 F.2d 1216, 1229 (11th Cir. 1989) ("[A]mong severed co-defendants, there is no absolute right to be tried in a certain order; each case must be evaluated on its own facts."); *see also Poston*, 902 F.2d at 98 (same); *Mack v. Peters*, 80 F.3d 230, 235 (7th Cir. 1996) ("[D]efendants have no inherent right to be tried in a certain order.").

We have established a framework for evaluating a severance request that is predicated on an effort to secure a codefendant's testimony. *See United States v. Parodi*, 703 F.2d 768 (4th Cir. 1983). And that framework is helpful in assessing a challenge to a trial sequence ruling.[12] Judge Russell's *Parodi* decision explains that a trial court should assess whether the movant has established the following:

> (1) a bona fide need for the testimony of his co-defendant, (2) the likelihood that the co-defendant would testify at a second trial and waive his Fifth Amendment privilege, (3) the substance of his co-defendant's testimony, and (4) the exculpatory nature and effect of such testimony.

*See Parodi*, 703 F.2d at 779.

---

[12] At least three of our sister circuits have found that the standards for reviewing severance motions are useful guidance in reviewing a challenge to a trial sequence ruling. *See, e.g.*, *Singletary*, 122 F.3d at 1393; *Mack*, 80 F.3d at 235; and *Byrd*, 428 F.2d at 1022.

Although Sheriff McCabe contends on appeal that he was prejudiced by the district court's trial sequence ruling — asserting that he was denied access to the exculpatory evidence of Boyle's prospective testimony — there was no showing that Boyle, if he had been tried first, would have waived his Fifth Amendment privilege and testified in favor of McCabe. Indeed, Boyle's lawyer confirmed to the trial court that Boyle would neither waive his Fifth Amendment privilege nor testify, stating that:

> [E]ven if [Boyle] were to be tried before Mr. McCabe, he will not provide testimony in a later trial of Mr. McCabe because . . . he would be entitled to assert his Fifth Amendment privilege against self-incrimination.

*See* J.A. 284; *see also United States v. Oloyede*, 933 F.3d 302, 312 (4th Cir. 2019) (concluding that appellants failed to satisfy *Parodi* framework because they had "no evidence" that their codefendant would waive his Fifth Amendment privilege); *United States v. Medford*, 661 F.3d 746, 754 (4th Cir. 2011) (ruling that there was no abuse of discretion where codefendant's "representation was, at best, equivocal regarding his willingness to waive his Fifth Amendment rights if the trials were severed").

Put simply, the district court exercised its broad discretion and scheduled Sheriff McCabe's trial to be conducted first. The court carefully justified that decision by explaining, inter alia, that the "interests of efficiency favor trying Mr. McCabe first on all charges." *See* Trial Sequence Order 4. And it recognized and emphasized that McCabe was the "primary defendant." *Id.* In the Trial Sequence Order, the court also explained that Sheriff McCabe was

> charged with offenses related to two bribery schemes. These schemes overlapped in time and [McCabe's] involvement in each scheme was similar:

26

he is alleged to have solicited and accepted bribes from a contractor providing services to the Norfolk City Jail.

*Id.* In these circumstances, we cannot say that the trial court acted arbitrarily or legally erred in any respect. And the court did not abuse its discretion in ruling that McCabe would be tried first.

## B.

Sheriff McCabe also challenges the district court's admission of alleged hearsay statements made by Undersheriff Hughey — that is, the "Hughey Statements" — arguing that the court's Evidence Ruling contravened Rules 801(d)(2)(D) and 403 of the Federal Rules of Evidence, as well as McCabe's confrontation rights under the Sixth Amendment. To reiterate, Hughey had separately advised Rader and Ballance, who were employees of Sheriff McCabe, that McCabe had directed Hughey to provide confidential inside information about competing bids to Boyle and CCS during the 2010 medical services RFP process. Hughey also advised both Rader and Ballance that he had declined to do so. And we review a trial court's ruling on the admission of evidence for abuse of discretion. *See Macsherry v. Sparrows Point, LLC*, 973 F.3d 212, 221 (4th Cir. 2020).

## 1.

Pursuing this evidence admission issue, Sheriff McCabe primarily argues that the district court erred in admitting the Hughey Statements under Rule 801(d)(2)(D). That is, McCabe asserts that those Statements were inadmissible hearsay, because they were made outside the scope of Hughey's employment.

27

Rule 801(d)(2) identifies specific categories of out-of-court statements that are not hearsay.[13] Most relevant here is subsection (D) thereof, which provides that a statement offered against an opposing party, and which was "made by the party's agent or employee on a matter within the scope of that relationship and while it existed" is not hearsay. *See* Fed. R. Evid. 801(d)(2)(D). In its Evidence Ruling, the district court determined that the Hughey Statements are not hearsay under Rule 801(d)(2)(D). Although Sheriff McCabe argued strenuously that the Hughey Statements were not made within the scope of Hughey's employment relationship with McCabe, the court rejected that proposition.

On appeal, Sheriff McCabe contends that the Evidence Ruling was erroneous. As background for our analysis of that contention, our Court has explained, in an unpublished setting, that

> [t]he concern of Rule 801(d)(2)(D) is not whether the employee was carrying out the employer's wishes or whether the employee's statement was authorized. Rather, the court must determine whether the subject matter and circumstances of the out-of-court statement demonstrate that it was about a matter within the scope of the employment.

---

[13] The evidence rule that the parties dispute is Rule 801(d)(2)(D), which spells out the applicable exclusion from hearsay. In relevant part, it provides:

> **(d) Statements That Are Not Hearsay.** A statement that meets the following conditions is not hearsay:
> . . .
> > **(2) An Opposing Party's Statement.** The statement is offered against an opposing party and:
> > . . .
> > > **(D)** was made by the party's agent or employee on a matter within the scope of that relationship and while it existed.

*See* Fed. R. Evid. 801(d)(2)(D).

*See United States v. Poulin*, 461 F. App'x 272, 282 (4th Cir. 2012).

In Sheriff McCabe's trial, the prosecution proved that Hughey was an employee of Sheriff McCabe, and that the Hughey Statements were "about a matter within the scope of [Hughey's] employment." *See Poulin*, 461 F. App'x at 282. And McCabe himself acknowledged in his trial testimony that Hughey "ran the day-to-day operations in [McCabe's] absence." *See* J.A. 3039. As the Evidence Ruling related, Hughey reported directly to Sheriff McCabe, and "[o]ne of [Hughey's] job responsibilities was to assist in the selection of food and medical services providers for the Norfolk City Jail." *See* Evidence Ruling 4. The Evidence Ruling explained that Hughey "was also one of three individuals responsible for evaluating the bids that were submitted in response to the 2010 RFP from medical services providers." *Id.* In the context of these factual determinations, the trial court did not err in ruling that the Hughey Statements were "clearly related to Mr. Hughey's area of authority and were made during his time working for" McCabe. *Id.* (citing *Yohay v. City of Alexandria Emps. Credit Union, Inc.*, 827 F.2d 967, 969 (4th Cir. 1987)).

The Evidence Ruling also properly rejected Sheriff McCabe's assertion that the Hughey Statements were inadmissible because they were "office gossip," and that Hughey was simply "blowing off steam" when he spoke to Rader and Ballance. In so ruling, the trial court emphasized that "the statement of an agent regarding a matter within the scope of the agency relationship [does not] become gossip merely because it is uttered at a restaurant over lunch rather than within the four walls of an office." *See* Evidence Ruling 5.

Put simply, Hughey had extensive direct involvement in the 2010 RFP process as an employee of the Sheriff, and the challenged out-of-court statements, i.e., the Hughey Statements, specifically related to the 2010 RFP process. We therefore reject McCabe's contention that the district court abused its discretion in ruling that the Hughey Statements were excluded from hearsay.

2.

Sheriff McCabe also maintains, however, that although the Hughey Statements were "relevant evidence," the trial court's admissibility ruling was fatally erroneous because it contravened Rule 403 of the Federal Rules of Evidence. Rule 403 authorizes a trial court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of," as relevant here, "unfair prejudice." *See* Fed. R. Evid. 403. At its core, Rule 403 favors the inclusion and admission of evidence, and a trial court possesses broad discretion about whether a specific piece of evidence should be excluded due to Rule 403 concerns. *See United States v. Miller*, 61 F.4th 426, 429 (4th Cir. 2023) ("Rule [403] is a rule of inclusion, generally favoring admissibility.").

The bar for exclusion of relevant evidence under Rule 403 is quite high. *See Miller*, 61 F.4th at 429. Sheriff McCabe argues, however, that the Hughey Statements — even as "relevant evidence" — were "unfairly prejudicial," and that the prejudice of their admission against him outweighed their probative value. The crux of McCabe's unfair prejudice contention consists of unsubstantiated assertions that Hughey, Rader, and Ballance were biased against McCabe, and that the Hughey Statements were inconsistent and unreliable.

30

Although bias and unreliability are valid bases for impeachment of a witness, *see, e.g.*, Fed. R. Evid. 608 (witness character for truthfulness or untruthfulness); Fed. R. Evid. 616 (impeachment by bias or prejudice), they do not typically rise to the level of "unfair prejudice" under Rule 403. *See Old Chief v. United States*, 519 U.S. 172, 180 (1997) (explaining that unfair prejudice "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged"). Nor is the risk of unfair prejudice "disproportionate to the probative value of" the Hughey Statements. *See United States v. Lentz*, 524 F.3d 501, 525 (4th Cir. 2008). In this situation, we are evaluating a trial court's admission of "relevant evidence" under the deferential standard of abuse of discretion. And Sheriff McCabe's assertions of witness bias and credibility do not rise to "Rule 403's high bar." *See Miller*, 61 F.4th at 429.

In any event, Sheriff McCabe's contentions of bias and unreliability were, as the trial court explained in its Evidence Ruling, "more appropriately addressed through cross examination [of Rader and Ballance] or closing argument, not the exclusion of probative evidence." *See* Evidence Ruling 8. Counsel for McCabe were thereafter accorded a full opportunity to cross examine the witnesses and they did so thoroughly. In these circumstances, there was no abuse of discretion, and we are constrained to reject McCabe's position on Rule 403 as well.

3.

Finally, Sheriff McCabe argues that the district court's admission of the Hughey Statements contravened his Sixth Amendment rights under the Confrontation Clause.

31

Specifically, McCabe maintains that the court erred in ruling that the Hughey Statements were not testimonial under *Crawford v. Washington*, 541 U.S. 36 (2004). The Supreme Court's *Crawford* decision stands for the proposition that testimonial out-of-court witness statements are barred from admission under the Confrontation Clause, unless a witness is unavailable and the defendants had a prior opportunity to cross-examine him. *Id.* at 58.

In *Crawford*, the Supreme Court distinguished between testimonial and non-testimonial statements, recognizing that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *See* 541 U.S. at 51. The Hughey Statements fall within the latter type — they were not elicited from Rader and Ballance in the testimonial context, but rather made by him to coworkers in informal settings, including during a luncheon with Rader in a Mexican restaurant, and in Ballance's office. Moreover, the Hughey Statements were made in 2010, several years before Sheriff McCabe was indicted. *See United States v. Jordan*, 509 F.3d 191, 201 (4th Cir. 2007) ("The critical *Crawford* issue here is whether [the declarant], at the time she made her statements . . . believed these statements would be later used at trial."). Because the Hughey Statements were not testimonial, the Confrontation Clause is not implicated.

In sum, we reject Sheriff McCabe's contentions that the district court abused its discretion in admitting the Hughey Statements.

### C.

We now turn to Sheriff McCabe's contentions of error about the jury instructions. In a direct appeal, "[w]e review a district court's decision to give a particular jury

32

instruction for abuse of discretion, and review whether a jury instruction incorrectly stated the law de novo." *See United States v. Miltier*, 882 F.3d 81, 89 (4th Cir. 2018). Jury instructions are suitable when, "construed as a whole, and in light of the whole record, [the instructions] adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." *Id.*

1.

As a threshold matter, the parties disagree on an important point: whether Sheriff McCabe's appellate contentions concerning the jury instructions were properly preserved in the trial court. Pursuant to Rule 30(d) of the Federal Rules of Criminal Procedure:

> A party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate.

*See* Fed. R. Crim. P. 30(d). A failure to object to an instruction in a manner consistent with Rule 30(d) precludes appellate review, unless the court of appeals can identify "[a] plain error that affects substantial rights." *See* Fed. R. Crim. P. 52(b). Notably, McCabe's counsel had ample opportunities to object to the proposed instructions. And they failed to object to any of the instructions that McCabe now contests on appeal.

Sheriff McCabe now maintains that, even though his lawyers did not make any specific objections to the jury instructions, as required by Rule 30(d), he nonetheless preserved his appellate contentions on the instructions by way of pretrial motions and in related proceedings. For support, McCabe relies primarily on our 2005 decision in *United States v. Ebersole*, 411 F.3d 517 (4th Cir. 2005). He characterizes *Ebersole* as supporting his contention that a pretrial motion seeking dismissal of an indictment will preserve legal

33

assertions concerning the jury instructions. The *Ebersole* opinion, however, does not support that proposition.

In *Ebersole*, we ruled — consistent with Rule 30(d) — that a defendant's "failure to specifically object to [a jury] instruction during the trial would constrain us to review its substance for plain error only." *See Ebersole*, 411 F.3d at 526. In the context of a preservation issue like that contested here, however, *Ebersole* identified a single exception to a defendant's failure to comply with Rule 30(d). As explained therein, an instructional contention can be preserved by a pretrial challenge if it was thereafter renewed "in a directed verdict motion made pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure, before the jury retires." *Id.* (internal citations omitted).

The Rule 29 exception identified in *Ebersole* is not applicable here. Although McCabe presented a Rule 29 motion to the district court, his motion had nothing to do with the *McCormick*- and *McDonnell*-based contentions raised in his pretrial motion to dismiss the Indictment. *Ebersole*, on the other hand, concerned a rejected pretrial venue contention which the defendant renewed in his Rule 29 motion. Our *Ebersole* decision is therefore readily distinguishable.[14] For these reasons, McCabe's *McCormick*- and *McDonnell*-based

---

[14] In addition to our *Ebersole* decision, Sheriff McCabe relies on two of our other decisions, *United States v. Williams*, 81 F.3d 1321 (4th Cir. 1996), and *United States v. Wilson*, 118 F.3d 228 (4th Cir. 1997), to support his claim that his objections to the now-contested instructions were properly preserved. *Williams* and *Wilson*, however, apply exclusively to evidentiary challenges. Neither decision bears on the preservation of a jury instruction challenge.

contentions were not preserved in a manner consistent with the requirements of Rule 30(d).[15]

Because McCabe failed to properly preserve his jury instruction contentions, we review them for plain error only. Applying plain-error review, McCabe "must show (1) that the court erred, (2) that the error is clear and obvious, and (3) that the error affected his substantial rights, meaning that it affected the outcome of the district court proceedings." *See United States v. Catone*, 769 F.3d 866, 871 (4th Cir. 2014) (internal quotation marks omitted). And even when those plain error requirements have been satisfied, we will not correct the error unless it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *See United States v. Olano*, 507 U.S. 725, 732 (1993) (cleaned up).

### 2.

Having identified the applicable standard of review, we turn to Sheriff McCabe's various contentions concerning the jury instructions. Each of McCabe's 11 convictions implicated either the offense of honest services mail fraud or that of Hobbs Act extortion. In turn, each of those offenses required proof of an underlying act of bribery. *See, e.g.*, *McDonnell v. United States*, 579 U.S. 550, 562 (2016) ("The theory underlying both the honest services fraud and Hobbs Act extortion charges was that Governor McDonnell had

---

[15] The Rule 30(d) requirements are not unduly harsh. An error that is sought to be presented on appeal simply has to be properly preserved in the trial court. We are a court of review, and not of first view. *See Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 982 F.3d 258, 264 (4th Cir. 2020). A lawyer is not allowed to sit on his hands, fail to present his legal contentions to the trial court, and thereby mousetrap the judge. It is therefore critical for lawyers to comply with Rule 30(d).

35

accepted bribes from Williams.").  In defining bribery, the district court recited that the

parties appeared to agree on the applicability of § 201 of Title 18.[16]

McCabe maintains on appeal that the district court erred with respect to six bribery-

related instructions — that is, Instructions 55, 56, 57, 58, 60, and 71.  Five of the challenged

instructions implicate legal principles established in the *McCormick* decision.  Those

instructions — which we call the "*McCormick*-based Instructions" — are:

- Instruction 55, entitled "Quid Pro Quo";

- Instruction 56, entitled "Bribery Need Not Be Express";

- Instruction 57, entitled "Bribery — Mixed Motive No Defense";

- Instruction 58, entitled "Bribery — Beneficial Act No Defense"; and

- Instruction 71, entitled "Third Element — Knowledge That the Public Official Obtained a Thing of Value in Return For Official Action."

In relying on *McCormick*, McCabe contends that the trial court failed to properly

instruct the jury on what constitutes an "explicit" quid pro quo — an essential element of

proving bribery involving campaign contributions.  That is, McCabe asserts that the court

---

[16] Section 201 of Title 18, entitled "Bribery of public officials and witnesses," provides, in relevant part, as follows:

> Whoever . . . being a public official[,] . . . directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally . . . in return for . . . being influenced in the performance of any official act . . . shall be fined . . . or imprisoned for not more than fifteen years.

*See* 18 U.S.C. § 201(b).

erred in instructing the jury that an "explicit" quid pro quo does not have to be an "express" quid pro quo.

McCabe also challenges two of the trial court's instructions on the bases of principles enunciated in *McDonnell v. United States*. Those instructions — which we call the "*McDonnell*-based Instructions" — are:

- Instruction 60, entitled "Official Act"; and

- Instruction 71, entitled "Third Element — Knowledge That the Public Official Obtained a Thing of Value in Return For Official Action."

In contesting the *McDonnell*-based Instructions, McCabe argues that they were erroneous because they advised the jury that a "thing of value" did not have to be correlated to a specific official action, and that the thing of value could be given to a public official to secure his services on an "as-needed" basis. Otherwise stated, in challenging the *McDonnell*-based Instructions, McCabe argues that the prosecution's reliance on the so-called "stream of benefits" theory of bribery was fatally erroneous.

As explained herein, however, the district court did not err in utilizing either the *McCormick*-based Instructions or the *McDonnell*-based Instructions.

a.

Turning first to Sheriff McCabe's challenges to the *McCormick*-based Instructions, he primarily contends that the district court failed to properly instruct the jury on the prosecution's burden to prove an "explicit" quid pro quo. Put simply, McCabe is incorrect in that regard. Instructions 55 and 56 properly defined the term "quid pro quo," as it

37

pertains to the bribery theory of honest services mail fraud.  In Instruction 55, for example, the court explained that

> [b]ribery involves the exchange of a thing or things of value for official action by a public official.  In other words, bribery involves a quid pro quo, a Latin phrase meaning "this for that" or "these for those."  Bribery also includes offers and solicitations of things of value in exchange for official action; that is, for the public official, bribery includes the public official's solicitation or agreement to accept the thing of value in exchange for official action whether or not the payor actually provides the thing of value and whether or not the public official ultimately performs the requested official action or intends to do so.

*See* J.A. 3489.  Continuing with Instruction 55, the court instructed the jury that an "explicit" quid pro quo is required when payments are made to a public official in the context of campaign contributions.  That is, the court therein explained that

> [w]here the thing or things of value solicited or received by a public official are the payment of campaign contributions, the government must further prove a meeting of the minds on the *explicit* quid pro quo.  This means the receipt of such contributions are taken under color of official right, if the payments are made in return for an *explicit* promise or understanding by the official to perform or not to perform an official act.  *While the quid pro quo must be explicit, it does not have to be express.*  Political contributions may be the subject of an illegal bribe even if the terms are not formalized in writing or spoken out loud.  *"Explicit" refers not to the form of the agreement between the payor and payee but the degree to which the payor and payee were aware of its terms*.

*Id.* at 3489-90 (emphases added).

Although the "explicit" quid pro quo requirement can be satisfied by proof of an "express" quid pro quo, the trial court, in Instruction 56, emphasized that an "explicit" quid pro quo does not need to be stated in "express" terms.  More specifically, the jury was advised that

38

> [t]he public official and the payor need not state the quid pro quo in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods. Rather, the intent to exchange may be established by circumstantial evidence, based on the defendant's words, conduct, acts, and all surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn from them.

*See* J.A. 3490. By way of Instructions 55 and 56, the court carefully instructed and emphasized to the jury that a quid pro quo in a bribery situation implicating campaign contributions must be "explicit," but does not need to be "express."

In Instruction 71, the court further emphasized that the explicit quid pro quo requirement, as explained in Instructions 55 and 56 in the context of honest services mail fraud offenses, applies also to the Hobbs Act extortion offenses. As pertinent here, the court instructed the jury that

> [a]s was the case with bribery [in the context of honest services mail fraud], the exchange or quid pro quo need not be stated in express terms, and the intent to exchange can be inferred from all the surrounding circumstances.

*See* J.A. 3502. McCabe maintains on appeal that the *McCormick*-based Instructions contravened the *McCormick* principles. He argues that those Instructions erred in explaining to the jury that, although a quid pro quo must be "explicit," it need not be "express."

Sheriff McCabe's contention in this regard relies on a misreading of the terms "explicit" and "express." Those terms have distinct meanings.[17] Although the difference

---

[17] When the Supreme Court decided *McCormick* in 1991, *Black's Law Dictionary* had defined the term "explicit" as: "Not obscure or ambiguous, having no disguised meaning or reservation. Clear in understanding." *See United States v. Blanford*, 33 F.3d 685, 696 n.13 (6th Cir. 1994) (quoting *Explicit*, BLACK'S LAW DICTIONARY (6th ed. (Continued)

between "explicit" and "express" may be subtle, it is important.  The term "express" simply means reduced to words, either in writing or spoken aloud.  The term "explicit," on the other hand, refers to something that is obvious and unambiguous.  And even though Justice Stevens's dissent in *McCormick* articulated his concern that the Court's decision could be read to require an "express" agreement, the majority opinion requires only "an explicit promise or undertaking by the official."  *See McCormick*, 500 U.S. at 273 (White, J.), 282 (Stevens, J., dissenting).  Put succinctly, the *McCormick* decision requires — in a bribery involving campaign contributions — a quid pro quo that is "explicit," but not necessarily a quid pro quo that is stated in words.

In various post-*McCormick* decisions, our sister circuits have consistently concluded that the "explicit" quid pro quo required in a Hobbs Act extortion prosecution involving campaign contributions does not need to be "express."  For example, the Ninth Circuit rejected the notion that the "explicitness requirement" of *McCormick* can be satisfied only if "an official has specifically stated that he will exchange official action for a contribution."  *See United States v. Carpenter*, 961 F.2d 824, 827 (9th Cir. 1992).[18]  And the Eleventh Circuit ruled that there is no requirement that a Hobbs Act extortion quid pro

---

1990)).  The term "express," on the other hand, was then defined as:  "Declared in terms; set forth in words.  Directly and distinctly stated. . . . Manifested by direct and appropriate language."  *Id.* (quoting *Express*, BLACK'S LAW DICTIONARY (6th ed. 1990)).

[18] For his part, Sheriff McCabe relies primarily on a Second Circuit decision for his appellate contention that an express promise is required for a quid pro quo bribery agreement.  *See United States v. Ganim*, 510 F.3d 134, 142 (2d Cir. 2007).  The *Ganim* case did not involve campaign contributions, and the distinction between an "explicit" and an "express" quid pro quo was not germane.

40

quo involving political contributions must be stated in "actual conversations by defendants" or "memorialized in writing." *See United States v. Siegelman*, 640 F.3d 1159, 1171 (11th Cir. 2011) ("Explicit . . . does not mean express."). Similarly, the Sixth Circuit concluded that *McCormick*'s quid pro quo mandate for political contributions is satisfied by simply "knowing the payment was made in return for official acts" — explaining that no "formalized and thoroughly articulated contractual arrangement" is needed. *See Blanford*, 33 F.3d at 696.

Indeed, if the "explicit" quid pro quo mandate meant that an "express" quid pro quo is essential, corrupt public officials could, as Justice Kennedy emphasized, escape Hobbs Act liability by "knowing winks and nods." *See Evans v. United States*, 504 U.S. 225, 274 (1992) (Kennedy, J., concurring). And, as the Seventh Circuit astutely put it, "[f]ew politicians say, on or off the record, 'I will exchange official act X for payment Y.'" *See United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015).

At bottom, Instructions 55, 56, and 71 of the *McCormick*-based Instructions were correct statements of the applicable law.[19] That is, they fairly explained, in the context of campaign contributions, that which is required for proving bribery. Consistent with the foregoing, we are satisfied that Sheriff McCabe's appellate contentions concerning the

---

[19] Two additional *McCormick*-based Instructions, that is, Instructions 57 and 58, are also being contested by Sheriff McCabe. He argues that those two Instructions "compounded" the trial court's *McCormick*-based errors, and thus "further prejudiced" him. *See* Br. of Appellant 41. Because the trial court did not err in Instructions 55, 56, and 71, however, there was no error that could be "compounded" by Instructions 57 and 58. Those challenges are therefore also rejected.

41

*McCormick*-based Instructions fail on the first prong of plain error review. Put simply, the trial court did not err or abuse its discretion in that regard.

b.

Sheriff McCabe next contends that the Supreme Court's 2016 *McDonnell* decision forecloses any prosecutions against him for Hobbs Act extortion, honest services mail fraud, or money laundering, that are predicated on bribery schemes where a "stream of benefits" has been exchanged for official acts on an "as-needed basis." As explained earlier, each of those offenses requires proof of a bribe. *See McDonnell*, 579 U.S. at 562. In pursuing that contention, McCabe maintains that the *McDonnell* decision overruled our precedent in *United States v. Jennings*, 160 F.3d 1006 (4th Cir. 1998). As explained herein, however, we are satisfied that the district court did not err in its formulation of the *McDonnell*-based Instructions.

In its Instruction 60, the trial court instructed the jury on the meaning of the term "official act," defining an official act as

> any decision or action on any question or matter, which at any time be pending, or which may by law be brought before any public official, in such public official's official capacity, or in such official's place of trust or profit.

*See* J.A. 3492. The trial court therein carefully explained that an "official act" would also include a public official "exerting pressure on another official to perform an official act or providing advice." *Id.* at 3492. On the other hand, the court specified that "[s]etting up a meeting, hosting an event, or talking to another official, without more," would not qualify as an "official act." *Id.* at 3493.

42

Thereafter, in Instruction 71, the trial court instructed the jury that "a given thing of value need not be correlated with a specific official action." *See* J.A. 3502. Rather, the thing of value "may be given with the intent to retain a public official's services on an as-needed basis, so that as opportunities arise the public official would take specific official action on the payor's behalf." *Id.* at 3502-03.[20]

As with his contentions against the *McCormick*-based Instructions, Sheriff McCabe overreads the *McDonnell* decision in his arguments against the *McDonnell*-based Instructions. He simply pursues an interpretation of *McDonnell* that is at odds therewith. The *McDonnell* decision specifically clarified the term "official act," as used in 18 U.S.C. § 201(a)(3), explaining that "setting up a meeting, calling another public official, or hosting an event does not, standing alone, qualify as an 'official act.'" *See McDonnell*, 579 U.S. at 567. The prosecution must prove that the public official "agreed to perform an 'official act' at the time of the alleged quid pro quo." *Id.* at 572-73. And the official act "must be more specific and focused than a broad policy objective." *Id.* at 578. Notably, the *McDonnell* decision did not mention the stream-of-benefits theory of bribery, nor did it refer to a theory of bribery based on official acts retained on an as-needed basis.

Importantly, McCabe has presented no authority that the stream-of-benefits theory of bribery is no longer valid. In fact, after the *McDonnell* decision, several of the courts of appeals have sustained the stream-of-benefits theory. The First Circuit, for example,

---

[20] Neither of the *McDonnell*-based Instructions refer to the term "stream of benefits." Nevertheless, the lawyers in these proceedings have used that term liberally in their various appellate submissions.

43

explained that bribery, in the context of honest services mail and wire fraud, does not require proof of "a tight nexus between any particular gratuity and a specific official act." *See Woodward v. United States*, 905 F.3d 40, 46 (1st Cir. 2018). Rather, the underlying acts of bribery can be established "through an ongoing course of conduct, so long as the evidence shows that the favors and gifts flowing to a public official are in exchange for a pattern of official actions favorable to the donor." *Id.* (cleaned up). The Second Circuit also ruled that the stream-of-benefits theory of bribery — in the context of honest services mail and wire fraud, Hobbs Act extortion, and money laundering — has survived post-*McDonnell*. The requirement is that the "particular question or matter" concerning the official act has been "identified at the time the official makes a promise or accepts a payment." *See United States v. Silver*, 948 F.3d 538, 558 (2d Cir. 2020).

And our colleagues on the Third Circuit have similarly ruled that bribery in the context of Hobbs Act extortion can be proved by evidence that "the public official understands that he is expected, as a result of the payment, to exercise particular kinds of influence or to do certain things connected with his office as specific opportunities arise." *See United States v. Repak*, 852 F.3d 230, 251 (3d Cir. 2017). Significantly, the Eighth Circuit carefully explained that a bribe underlying the offense of honest services wire fraud "may be paid with the intent to influence a general course of conduct," and that the prosecution is not required "to link any particular payment to any particular action." *See United States v. Suhl*, 885 F.3d 1106, 1115 (8th Cir. 2018).

Against that backdrop of compelling authorities, Sheriff McCabe nevertheless argues that Judge Michael's *Jennings* decision was overruled by *McDonnell*. In evaluating

44

that contention, "[w]e do not lightly presume that the law of the circuit has been overturned, especially, where, as here, the Supreme Court opinion and our precedent can be read harmoniously." *See Taylor v. Grubbs*, 930 F.3d 611, 619 (4th Cir. 2019) (internal quotation marks and citation omitted). In *Jennings*, Judge Michael acknowledged the legal validity of the stream-of-benefits theory of bribery. He succinctly explained that, in such a case, "the evidence shows a course of conduct of favors and gifts flowing to a public official in exchange for a pattern of official actions favorable to the donor." *See* 160 F.3d at 1014. His *Jennings* opinion aptly concluded that

> the government need not show that the defendant intended for his payments to be tied to specific official acts (or omissions). . . . Rather, it is sufficient to show that the payor intended for each payment to induce the official to adopt a specific course of action.

*Id.* Because *Jennings* and *McDonnell* can be applied harmoniously, *Jennings* has not been overturned.

The ruling that Sheriff McCabe seeks today — that the stream-of-benefits theory of bribery cannot be legally pursued post-*McDonnell* — would simply reward corrupt bribery schemes that involve multiple exchanges over a period of time, as opposed to the so-called "one-and-done handshake deal." Sheriff McCabe seems to even suggest that his involvement in bribery schemes spanning more than 20 years should mitigate in his favor. *See* Br. of Appellant 57 (arguing that *McDonnell* forecloses prosecution's "attenuated theory of liability" where stream of benefits and official acts are exchanged for more than two decades). As explained in *Jennings*, however, "the intended exchange in bribery can be 'this for these' or 'these for these,' not just 'this for that.'" *See* 160 F.3d at 1014. As

45

such, "all that must be shown is that payments were made with the intent of securing a specific *type* of official action or favor in return." *Id.* (emphasis in original).

Thus, we are satisfied that the trial court did not abuse its discretion or err in any of its *McDonnell*-based Instructions.[21]  Because Sheriff McCabe cannot show that the court erred, his challenges to those Instructions fail at the first prong of the plain error test as well.[22]

In sum, the *McCormick*-based Instructions and the *McDonnell*-based Instructions, "construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles" in all relevant respects.  *See Miltier*, 882 F.3d at 89.  In

---

[21] We are obliged to observe that Sheriff McCabe's arguments about the jury instructions are substantially undermined by Instruction 59 — the "Goodwill" Instruction, which was given at McCabe's request.  It advised the jury that:

> Individuals may lawfully give a gratuity or gift to a public official to foster goodwill.  To prove that a gift is a bribe, rather than a lawful act of goodwill, the government must demonstrate that the gift is coupled with a particular criminal intent or quid pro quo.  You may refer to the instructions laying out the elements of bribery to make this determination.

> A gift to an official to foster a favorable business climate does not constitute a bribe.  It is not enough for the government to prove that the gift was given with the generalized hope or expectation of ultimate benefit on the part of the gift giver.  Vague expectations of some future benefit are not sufficient to make a gift of goodwill a bribe.

*See* J.A. 3491-92.  By the Goodwill Instruction, the trial court reduced the risk that the jury would equate "favoritism or cronyism" with bribery.  *See* Br. of Appellant 51.

[22] Because Sheriff McCabe's contentions on the challenged Instructions fail at the first prong of the plain error analysis, our disposition of those contentions would be the same under the less stringent standard of harmless error review.

46

these circumstances, we are satisfied that the trial court did not either mislead or confuse the jury.

## D.

Sheriff McCabe's final contention on appeal is that the district court erred in calculating the amount of loss in connection with his sentencing. We review a district court's sentencing decisions "under a deferential abuse-of-discretion standard." *See United States v. Dennings*, 922 F.3d 232, 235 (4th Cir. 2019). And "[i]n assessing whether a sentencing court properly applied the [Sentencing] Guidelines, we review the court's factual findings for clear error and its legal conclusions de novo." *Id.* (internal quotation marks omitted).

Sheriff McCabe contends that the value of the benefits he unlawfully received, rather than the profits made by ABL and CCS on the Jail contracts, should have been used to determine the amount of loss. In other words, he argues that the $261,000 in benefits he personally received, rather than the estimated $5.2 million in profits he secured for ABL and CCS, should be the relevant amount of loss in calculating any sentencing enhancement.[23] That proposition, however, is mistaken.

The Guidelines provide, inter alia, that a sentencing enhancement applies to honest services mail fraud and Hobbs Act extortion convictions in situations where

---

[23] The profits of ABL and CCS are the net profits of those businesses from the various Jail contracts, not the total payments they received on the contracts. Because the net profits of ABL and CCS were over $3.5 million but below $9.5 million, the PSR recommended an 18-level enhancement to McCabe's base offense level, which was 14. *See* J.A. 11520, 11523.

47

the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest, exceeded $6,500.

*See* USSG § 2C1.1(b)(2).  The number of enhancement levels to be applied depends on the corresponding amount of loss.  A loss valued between $6,500 and $15,000, for example, corresponds with a two-level enhancement to the base offense level.  *Id.* § 2B1.1.  At the highest range, for loss valued at more than $550 million, the Guidelines recommend a 30-level enhancement.  *Id.*

The relevant Guidelines commentary also explains that "the value of . . . the benefit received" can include the profits made on a contract that was awarded in return for a bribe. *See* USSG § 2C1.1 cmt. n.3 (explaining value of "the benefit received or to be received" to include the net value of such benefit, e.g., "[a] $150,000 contract on which $20,000 profit was made was awarded in return for a bribe; the value of the benefit received is $20,000").  Because the Guidelines specify the use of "whichever is greatest," it was appropriate for the sentencing court to use the $5.2 million in estimated net profits of ABL and CCS as the relevant amount of loss, rather than the $261,000 that Sheriff McCabe received as bribes.

In further support of his sentencing contention, Sheriff McCabe argues that "there was no financial loss to the city" due to his fraud and bribery schemes and that the sentencing court erred in using "projected profits for years when no records existed to support the profit calculations."  *See* Br. of Appellant 94.  He further maintains that there was "no evidence that [he] ever disregarded the recommendation of the RFP committee or

48

exerted any influence with respect to the award or extension of these contracts." *Id.* at 95. In our view, those contentions are attempts to relitigate facts relied on by the court. And McCabe makes no claim that the court abused its discretion at sentencing by relying on a clearly erroneous finding of fact.

At bottom, in applying the 18-level sentencing enhancement, the district court relied on the Guidelines as well as our precedent, which has upheld upward adjustments to the base offense level for conspiracy to bribe a public official, based upon the value of the benefits received, rather than the value of the bribe, where the benefits from the bribe were greater. *See, e.g.*, *United States v. Kant*, 946 F.2d 267, 269 (4th Cir. 1991). Because the sentencing court's application of the sentencing enhancement was grounded in the Guidelines and our precedent, the court did not abuse its discretion, and Sheriff McCabe's sentencing contentions must be rejected.

## III.

Pursuant to the foregoing, we reject Sheriff McCabe's various contentions of error and affirm his convictions and sentences.

*AFFIRMED*