**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 24-4376**

———————————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JACKY LYNN MCCOMBER, f/k/a Jacky Lynn Kimmel,

Defendant - Appellant.

———————————

Appeal from the United States District Court for the District of Maryland, at Baltimore. Ellen Lipton Hollander, Senior District Judge.  (1:21-cr-00036-ELH-1)

———————————

Argued:  September 12, 2025                    Decided:  February 2, 2026

———————————

Before THACKER, QUATTLEBAUM and HEYTENS, Circuit Judges.

———————————

Affirmed by unpublished per curiam opinion.

———————————

**ARGUED:**  Crystal L. Weeks, WEIL, GOTSHAL & MANGES, LLP, Washington, D.C., for Appellant.  William G. Clayman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  Paresh S. Patel, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland; Andrew S. Tulumello, Laurel L. Zigerelli, Washington, D.C., Alli G. Katzen, Marina Masterson, WEIL, GOTSHAL & MANGES LLP, Miami, Florida, for Appellant.  Kelly O. Hayes, United States Attorney, David C. Bornstein, Assistant United States Attorney, Jefferson M. Gray, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

After a lengthy trial, a jury convicted Jacky McComber ("Appellant") of perjury and violations of the False Claims Act. Appellant now challenges the admission of a summary chart into evidence, the sufficiency of the evidence, the jury instructions, and the district court's loss calculations. She also alleges prosecutorial misconduct.

Because Appellant has not met the high burden of demonstrating that justice compels a new trial, we affirm.

I.

Following a career as a public school teacher, Appellant became a full-time information technology ("IT") professional. Appellant honed her skills at two small firms and developed particular talents for management and business development. In 2004, she received a call from a colleague who asked if Appellant would join her in building a software development company that would eventually be known as InfoTek ("ITK"). Appellant accepted the opportunity and eventually became ITK's chief executive officer ("CEO"). At its peak, ITK had around 90 employees and a valuation in the millions.

In July 2011, ITK entered into a contract with the United States National Security Agency ("NSA"). Per the contract, ITK became the primary service provider for the NSA, maintaining and upgrading essential software and IT systems at the agency's National Security Operations Center ("NSOC") and its Counter Terrorism Mission Management Center. The NSA named the project "Ironbridge."

The NSA required secrecy. With few exceptions, no one was allowed to work on Ironbridge outside the confines of the NSOC. Consequently, no ITK employee could

access the IT systems they were charged with maintaining unless they were physically present at the NSOC.  Nor could they access their project email accounts or even call on-site employees from outside the NSOC.  As a result, there was "very little" work ITK employees could perform outside the secure facility.  J.A. 1347, 1491.[1]

The contract for Ironbridge included a "Firm-Fixed-Price Level-of-Effort" ("FFP-LOE") billing method.  Unlike an ordinary services contract, in which one party agrees to pay a fixed price for a given outcome, an FFP-LOE contract is for a fixed number of working hours paid at a given hourly rate.  The Ironbridge contract set maximum total work hours for the life of the contract to be billed by employees performing specific roles.  Relevant here, the contract allocated 800 working hours to the "senior program manager" ("SPM"), who it tasked with "managing all aspects of the contract," including serving as the "official point of contact" between ITK and the NSA and ensuring that the project was adequately staffed.  J.A. 4439, 7077–78.  But the contract did not charge the SPM with contributing to day-to-day technical tasks.  Both NSA and ITK employees described the SPM as a "quarter-time position," meaning that it would ordinarily require no more than ten working hours each week to perform adequately.  *Id.* at 1481.

Pursuant to an FFP-LOE contract, a contractor certifies that she spent exactly the billed amount of time performing contract services.  The Ironbridge contract thus made clear that *effort* in Firm-Fixed-Price Level-of-Effort includes only "effort in direct support of the contract," and that "[t]he contract does not permit billing for travel, lunch, or work

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

4

performed at . . . non-work locations or other effort which does not have a specific and direct contribution to tasks described." J.A. 7079.

In March 2016, ITK's SPM on the Ironbridge contract left the company. Appellant stepped in to fill the role on an interim basis while also retaining her title as CEO. She had served in this dual capacity several times in the past. In each of those earlier stints, Appellant had billed around seven hours each week to the Ironbridge contract in her capacity as the SPM. But over the next 19 months, she billed 2,603.5 hours to Ironbridge -- an average of more than 30 hours per week. Appellant billed *exactly* 8.0 hours nearly every time she charged Ironbridge in her capacity as the SPM. She was paid for that time at a rate of approximately $150 per hour and all together charged the NSA nearly $400,000.

Appellant later attributed this four-fold increase in charged time to changes in the circumstances surrounding the contract that, in her telling, necessitated her own direct involvement. In fact, she claimed, "it wasn't unusual for [her] to actually invest twelve and fourteen hours into the Ironbridge program [in a single day] but [she] wouldn't bill all of that time." J.A. 2670–71. Appellant did not, however, explain the changed circumstances that led to her increased involvement. And NSA and ITK employees alike disagreed with Appellant's assessment of her work. Several claimed that they rarely had contact with Appellant during the crucial period of March 2016 through September 2017. Nor were there substantial personnel changes or ongoing planning discussions that would have necessitated Appellant's involvement as the SPM. One of Appellant's direct reports was even of the view that *he* was performing the duties of the SPM instead of Appellant.

5

Indeed, during the entire 19 month period, Appellant was physically present at the NSOC for only 259 hours -- just under ten percent of her total billed time.

In March 2017, the chief financial officer for ITK suddenly departed. At that point, Shilo Weir, ITK's chief operations officer and second in command, took on the task of approving time sheets. Weir soon noticed discrepancies between Appellant's billed hours and her daily activities. After an investigation, Weir wrote an anonymous letter to the NSA citing specific examples of "time periods that are easily confirmed as reported fraudulently." J.A. 471. "[H]owever, the actual extent of the fraudulently reported time is far greater," she concluded. *Id.* at 471. Thereafter, Weir promptly quit ITK.

The NSA investigated the allegations contained in Weir's letter. The agency's chief investigator, Lori Hazenstab, began comparing Appellant's time sheets with ITK's internal data and Appellant's social media posts. Hazenstab also interviewed several witnesses, including Appellant. Appellant denied overbilling the agency and asserted that her practice of logging exactly eight hours every time she billed Ironbridge accurately reflected her work habits and contributions. Although she conceded some "mistakes," Appellant repeatedly asserted that her billings were generally accurate. J.A. 565–93.

That was not the case. One ITK employee stated that in her observation, Appellant spent "minimal to none" of her time on Ironbridge, held the SPM position "in name only," and delegated most of her role to the Ironbridge technical lead. J.A. 439–40. Other ITK employees concurred with that assessment. Rather than overseeing Ironbridge for thirty hours each week as reflected in Appellant's billing, the investigation revealed that

6

Appellant spent most of her time at social events, networking to cultivate new business for ITK, and working in her capacity as CEO of ITK on matters unrelated to Ironbridge.

Investigators identified dozens of specific days on which Appellant billed exactly eight hours to Ironbridge while also engaging in unrelated activities. For example, on April 8, 2016, Appellant spent three hours at the NSOC before leaving to attend a concert, yet she billed eight hours to Ironbridge. On May 4, Appellant billed eight hours despite spending the entire workday in a meeting with another ITK client. On July 27, Appellant traveled from Maryland to Tuscaloosa, Alabama to drop her daughter off at college, but still billed eight hours to Ironbridge. On August 11, Appellant billed eight hours to Ironbridge but later complained to subordinates that she had actually "wasted [her] entire day" feuding with her ex-husband. J.A. 5921. On five separate occasions between September 2016 and June 2017, Appellant attended day long golfing events, often followed by happy hours and other social gatherings, while billing the NSA eight hours each day. On June 15, 2017, Appellant traveled to Georgia, spent the day with a prospective new client for ITK, and billed eight hours. She also spent the next day with the same client, yet billed another eight hours to Ironbridge. On June 23, Appellant billed exactly eight hours while attending a high school reunion in Virginia. On July 17, Appellant emailed her subordinates to let them know that she had "virtually no contact for all of last week" with either the NSA or ITK members and was thus unprepared for an upcoming meeting. *Id.* at 5923. Yet, she had billed 32 hours to Ironbridge for the week in question.

Ultimately, in February 2021, Appellant was charged with one count of perjury and nineteen counts of submitting false claims to the federal government -- one for each

7

monthly billing report she submitted to the NSA as SPM for Ironbridge. Following a 16 day jury trial, Appellant was found guilty on all 20 counts.

At sentencing. the district court determined that the United States Sentencing Guidelines ("Guidelines") base offense level was six and there was a ten level increase based on its finding of $176,913 in losses to the NSA. *See* U.S.S.G. § 2B1.1(b)(1)(F). The court also ordered restitution in that amount. But it declined to impose an additional two-level enhancement requested by the Government for obstruction of justice. Appellant's total offense level was thus sixteen with a criminal history level of I, because Appellant had no prior convictions. This resulted in a Guidelines imprisonment range of 21–27 months. The district court varied downward and sentenced Appellant to 13 months of incarceration to be followed by two years of supervised release. In exercising its discretion to vary downward, the court considered the statutory factors outlined in 18 U.S.C. § 3553(a), the seriousness of the offenses, Appellant's lack of candor with investigators and the court, her likelihood of re-offending, and Appellant's personal history, including her former work as a public school teacher.

Appellant raises a number of issues on appeal. She argues that her conviction was tainted because the court admitted a Government spreadsheet summarizing the evidence that Appellant contends is misleading. In addition, she challenges the evidentiary bases of her convictions, alleges errors in the jury instructions, and claims that prosecutorial misconduct tainted the verdict. Finally, she claims that the loss calculation was incorrect.

II.

A.

### The District Court Did Not Commit Plain Error by Admitting The Government's Summary of Evidence Exhibit.

1.

At issue during the trial were Appellant's actions, statements, locations, and time reports for thousands of hours over hundreds of days spanning a nineteen month period. The NSA investigators accumulated more than 30,000 pages of documentary evidence.

The Government attempted to distill this information for the jury via a 55 page spreadsheet. Among other information, the spreadsheet purported to identify the dates and times that Appellant accessed the NSOC; the total number of hours during which the facility's key access system could verify her presence; the hours she billed for those days; the alleged difference between her confirmed and billed hours; and, in a column labeled "NOTES," relevant, non-numerical facts that the Government associated with each time entry, such as internal communications between ITK employees, charges from Appellant's credit card, hotel and travel bookings, and descriptions of Appellant's social media posts. The spreadsheet also employed a color coding system, with each color intended to depict Appellant's various non-work related activities. The spreadsheet was admitted as substantive evidence pursuant to Federal Rule of Evidence 1006(a).

Appellant now argues that the spreadsheet should not have been admitted because it did not comply with Rule 1006(a), contained inaccuracies, and, in any case, was unduly prejudicial pursuant to Rule 403 of the Federal Rules of Evidence.

9

2.

Ordinarily, we review preserved evidentiary objections for abuse of discretion. *United States v. Walker*, 32 F.4th 377, 394 (4th Cir. 2022). When a district court abuses its discretion, its "[e]videntiary rulings are . . . subject to harmless error review." *United States v. Caldwell*, 7 F.4th 191, 204 (4th Cir. 2021). "[A]n error is harmless if [it is] 'highly probable that it did not affect the judgment.'" *Id.* (quoting *United States v. Burfoot*, 899 F.3d 326, 340 (4th Cir. 2018)). But when a party fails to object to the admission of an item of evidence, we engage in plain error review. Plain error requires the appellant to demonstrate that "(1) there was error; (2) the error was plain; and (3) the error affected [her] substantial rights." *United States v. Cowden*, 882 F.3d 464, 475 (4th Cir. 2018). And even when those plain error requirements have been satisfied, we will not correct the error unless it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. McCabe*, 103 F.4th 259, 279 (4th Cir. 2024) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)).

Appellant claims that she objected to the spreadsheet in a pre-trial motion in limine and again at trial. Not so. First, the pre-trial motion Appellant cites concerned the admissibility of a summary of her billed hours generated by ITK's web based billing platform -- not the spreadsheet about which she now complains. Moreover, her requested relief was not the exclusion of the spreadsheet of her billed hours, but rather a request to admit expert testimony in order to contextualize the automated report.

Appellant also did not object at trial to the admission of the spreadsheet in question. She directs us to a portion of the trial transcript where she alleges that counsel made such

10

an objection. But in that exchange, Appellant's counsel only complained that "repeatedly suggesting that any off-site work was not permitted under the contract [is] absolutely prejudicial." J.A. 1870. That is a wholly different issue than the one Appellant now seeks to argue. In fact, the summary spreadsheet was not even mentioned during the exchange. Yet, notably, the Government had twice utilized the summary spreadsheet at issue earlier in the trial, both times without objection from Appellant. Indeed, when the Government moved for admission of the spreadsheet at issue, Appellant did not object.

Therefore, we review the district court's admission of the summary spreadsheet for plain error.

### 3.

Rule 1006 permits admission of summary charts to serve as surrogates for voluminous, admissible evidence.[2] *United States v. Ortiz Orellana*, 90 F.4th 689, 699 (4th Cir. 2024). The Advisory Committee Notes clarify that Rule 1006 summaries are themselves treated as evidence because they are often "the only practicable means of making their contents available to the judge and jury." Fed. R. Evid. 1006. Consequently, a summary must be objective and must not serve as an editorial for one party's case. *Ortiz*

---

[2] Congress amended Rule 1006 after Appellant's trial. It now expressly distinguishes between summaries used to "prove the content of voluminous admissible [records]" and "illustrative aid[s]," which are instead governed by the new Rule 107, effective December 1, 2024. Fed. R. Evid. 107. Unlike a Rule 1006 summary, an illustrative aid is not evidence and "must not be provided to the jury during deliberations unless all parties consent or the court, for good cause, orders otherwise." *Id.* But in any case, this amendment did not alter the admissibility of a summary as substantive evidence. *See* Fed. R. Evid. 1006 (Dec. 1, 2011 to Nov. 30, 2024).

11

*Orellana*, 90 F.4th at 699–700.  Instead, commentary is properly reserved for illustrative aids, which, following the 2024 Amendments, are the subject of Rule 107.  *Id.* at 699. Thus, a proponent of a Rule 1006 summary may not present favorable inferences to the jury in the guise of record evidence.  *United States v. Janati*, 374 F.3d 263, 272–73 (4th Cir. 2004); *see also United States v. Johnson*, 54 F.3d 1150, 1158–61 (4th Cir. 1995); Roger C. Park et al., Evidence Law, 599–600 (2d ed. 2004).  Here, the Government's summary spreadsheet runs afoul of Rule 1006 inasmuch as it includes a "NOTES" column which provides commentary on the evidence presented.

Nonetheless, Appellant cannot overcome the plain error standard of review.  Over the course of a 16 day trial, the Government presented a mountain of evidence.  Witness testimony from NSA and ITK employees, volumes of circumstantial evidence, and even Appellant's own social media posts overwhelmingly supported the jury's finding that Appellant repeatedly inflated her billing hours.  Therefore, even assuming plain error and setting the spreadsheet aside, the error did not "seriously affect[] the fairness, integrity or public reputation of [the] judicial proceedings." *United States v. McCabe*, 103 F.4th 259, 279 (4th Cir. 2024).  The jury was presented more than enough evidence to convict.

## B.
### Appellant's Conviction was Based on Sufficient Evidence.

Appellant claims that the district court erred in denying her post-trial motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.

We review de novo the denial of a motion for a judgment of acquittal. *United States v. Watkins*, 111 F.4th 300, 308 (4th Cir. 2024).  When reviewing the sufficiency of the

12

evidence after a conviction, the evidence and all reasonable inferences must be viewed in the light most favorable to the Government. *United States v. Dinkins*, 691 F.3d 358, 387 (4th Cir. 2012). "[T]he jury's verdict must stand unless we determine that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Watkins*, 111 F.4th at 308.

### 1.
### The False Claims Act Counts

To sustain convictions per the False Claims Act, the Government must prove beyond a reasonable doubt that Appellant (1) submitted false claims and (2) knew each claim was materially false. *United States v. Whyte*, 918 F.3d 339, 351 n.12 (4th Cir. 2019).

As to the first element, Appellant argues that the evidence cannot have been sufficient to sustain the conviction because (1) each day contained more hours than Appellant billed; (2) no witness could account for Appellant's actions during all 24 hours of each billing day; and (3) at least eight hours of unaccounted time thus remained in each contested day. Therefore, Appellant asserts that no one can say definitively that Appellant did not actually work the hours she billed.

But the jury had sufficient evidence to discount that theory. For example, the jury heard repeatedly that "very little" Ironbridge work -- including the duties of the SPM -- could be performed outside the NSOC. *Id.* 297–302, 1346–47, 1491. And they heard testimony from an ITK employee who claimed that Appellant could not have been performing the duties of the SPM because he was himself performing those duties instead.

13

And the jury heard testimony from multiple witnesses that the SPM role was "a quarter-time position," meaning that it required ten or fewer hours each week to perform adequately. J.A. 1481, 1546–58. However, Appellant billed far more than "quarter time" hours. She billed an average of more than thirty hours per week during the relevant period and she did so overwhelmingly from outside the NSOC. And there are dozens of records demonstrating that on days Appellant billed exactly eight hours to the NSA, she also participated in activities that foreclose the possibility that she could have actually performed the billed work. Even if the jury assumed Appellant could have, for example, spent eight hours working for the NSA on the same day she drove her daughter from Maryland to Alabama, Appellant's repeated off site billings conflict with the consensus among NSA and ITK employees that Ironbridge was an overwhelmingly on site project. Appellant's work and social patterns also conflict with the contract's clear statement that "[t]he contract does not permit billing for . . . work performed at any employee's residence or other non-work locations" without prior authorization. J.A. 7079. Thus, these facts support an inference that Appellant overbilled the government. If her theory raised a doubt for the jury, it was not a reasonable one.

Appellant also contends that disagreements about the nature of FFP-LOE contracts and the role of the SPM negate the mens rea required for conviction. She argues that because there was some disagreement as to exactly what was required of the SPM, the jury should have concluded that Appellant did not believe her billing to be fraudulent. But the Government's theory was not that Appellant billed the NSA for work not authorized under the contract. Rather, she was accused of billing the agency for work *she had not actually*

14

*done*, regardless of whether or not it was authorized by the contract.  As detailed above, the evidence in the record was sufficient to support a finding to that effect, and consequently, the inference that Appellant knew her billing practices were fraudulent.

2.

Perjury

Appellant also contests the sufficiency of the evidence related to her perjury conviction.  This count arose as a result of her October 2017 interview with the NSA's chief investigator, Hazenstab.[3]  First, when asked if she had included false claims in any of her Ironbridge time sheets, Appellant responded, "No."  J.A. 40.  Second, when asked if her practice of claiming exactly eight hours on almost every day that she billed time to Ironbridge was based on an accurate accounting of her working time, Appellant responded in the affirmative.  She explained, "I monitor my time throughout the day on what I'm doing for Ironbridge."  *Id.* at 40–41.

As to the first statement, Appellant merely repeats her argument that "the [G]overnment did not prove beyond a reasonable doubt that any of [Appellant's] invoices were in fact materially false."  Appellant's Opening Br. at 53.  As to the second statement,

---

[3] Before this interview, Appellant signed a waiver that stated,

> You are being asked to provide information as part of an investigation being conducted by the Office of the Inspector General into alleged misconduct and/or improper performance of official duties. . . . Any statement you furnish may be used as evidence in any future criminal or administrative proceeding, or both.

J.A. 39.

15

Appellant concedes that she did not enter her time on a daily basis but argues that fact is inapposite because she kept notes of her daily tasks. Significantly, Appellant omits that she also testified to throwing away those notes at the end of each day:

> [E]very single day I do lists and as things come on that day I add them to my list. I cross them off and I throw them away at the end of the day because I feel accomplished. . . . I wished I would have kept every single one of those lists because those were my actual accounting.

J.A. 2559. Last, Appellant broadly asserts that there is "no evidence" she knowingly made false statements. Appellant's Opening Br. at 50, 53.

A perjury conviction requires the Government to prove beyond a reasonable doubt that a defendant knowingly and willfully made a "materially false, fictitious, or fraudulent statement or representation" in "any matter within the jurisdiction of . . . the Government of the United States." 18 U.S.C. § 1001(a).

Appellant's October 2017 interview with the NSA investigators concerned allegations that she had defrauded the federal government -- a matter within federal jurisdiction. She was warned during that interview that her statements could be "used as evidence in any future criminal or administrative proceeding, or both." J.A. 39. The trial record overwhelmingly demonstrates that Appellant billed the NSA for more work than she performed. To reiterate, Appellant billed an average of 30 hours per week in her capacity as the SPM despite the consensus among NSA and ITK employees that the SPM role required no more than 10 hours of work each week. And although very little Ironbridge work could be performed away from the NSOC, Appellant billed 90 percent of

16

her hours remotely and often did so on days during which she also attended unrelated meetings or personal events.

Therefore, viewing the record in the light most favorable to the Government, we hold that a rational jury could have concluded that Appellant committed perjury when she testified that she did not submit falsified time sheets.

Whether Appellant also lied about keeping an accurate accounting of her billable hours is a closer question. Appellant testified that she kept handwritten notes concerning the hours she worked as the SPM for Ironbridge. But she also claims to have thrown those notes away at the end of each day. In contrast, other portions of Appellant's testimony and that of several ITK employees prove that Appellant did not log her time in ITK's accounting system each day as required by ITK policy. For example, ITK's chief financial officer testified at length about numerous incidents in which Appellant submitted time sheets days or even weeks late. It necessarily follows that for at least some days, Appellant claimed billable hours based solely on her recollection of what she had done on a given day, creating a substantial likelihood that she would not accurately recall the billable amount. Finally, Appellant can plausibly claim to have accurately accounted for her time only if there is evidence that she worked for at least the amount of time she billed, such that claiming exactly eight hours each day would not constitute fraudulent overbilling. But Appellant concedes that she "worked off-site 90% of the time," Appellant's Br. at 8, even though almost all Ironbridge work had to be performed on site at the NSOC. And as we have explained, it would have been almost impossible for Appellant to work all the hours she billed, perform her duties as CEO of ITK, and attend to her busy social calendar.

17

Therefore, viewing the record in the light most favorable to the Government, we hold that the jury had more than sufficient evidence to convict Appellant of perjury in connection with the accuracy of her timekeeping.

## C.
### The District Court's Jury Instructions Were Proper.

Appellant next argues that her conviction should be reversed because of an allegedly errant jury instruction. Specifically, Appellant challenges the following jury instruction:

> The Government does not contend that the [Appellant] violated the law if she worked off-site. . . . [T]he Government's position, as set forth in the indictment and as advanced at trial, is that evidence of whether and when the Defendant was present at NSA is relevant to the question of whether she was working as [the SPM] because some of the work on the Ironbridge contract concerned classified matters that could not be done off-site.

J.A. 3096–97.

"We review a district court's decision to give a particular jury instruction for abuse of discretion, and review whether a jury instruction incorrectly stated the law de novo." *McCabe*, 103 F.4th at 278 (quoting *United States v. Miltier*, 882 F.3d 81, 89 (4th Cir. 2018)). Where an appellant failed to properly preserve her objection to an instruction, we review only for plain error. *Id.* at 279.

Appellant concedes that she did not preserve her objection to this instruction. But she contends that by giving this instruction, the district court unconstitutionally shifted the burden of proof by suggesting that off-site work hours were presumptively fraudulent. Doing so, she argues, is plain and reversible error.

18

Far from shifting the burden, this instruction simply and plainly restates the central issue of the case: The site specific nature of Ironbridge is relevant to whether Appellant's overwhelmingly remote hours and conflicting off site engagements permit an inference of fraud. Moreover, the allegedly offending jury instruction begins with a statement that "the Government does not contend that [Appellant] violated the law if she worked off-site." J.A. 3096–97. This is clearly at odds with Appellant's argument. Beyond that, the district court also reiterated multiple times that the Government bore the burden of proof. *See, e.g.*, *id.* at 3066 ("It is for you alone to decide whether or not the Government has proven beyond a reasonable doubt the guilt of the Defendant as to each crime charged."); *id.* at 3070 ("I instruct you that the Defendant is presumed innocent of all charges. To convict the Defendant as to a particular charge, the burden is on the prosecution to prove her guilt as to each element of that charge beyond a reasonable doubt."); *id.* at 3100 (explaining yet again, *after* delivering the instruction Appellant complains of, that "the Government must prove beyond a reasonable doubt that the Defendant knowingly caused the submission of false or fraudulent invoices by InfoTek to the NSA.").

Thus, Appellant cannot demonstrate that the challenged jury instruction was plainly erroneous. To the contrary, the court's instruction informed the jury of the relevant legal principles and kept the burden of proof on the Government. Further, the court clearly specified, "evidence of whether and when [Appellant] was present at NSA is *relevant* to the question of whether she was working [as the SPM on Ironbridge]," but not alone dispositive of liability. J.A. 3097–98 (emphasis supplied).

19

## D.
### The Government Did Not Engage in Prosecutorial Misconduct.

Appellant claims that the Government engaged in prosecutorial misconduct warranting a new trial. Specifically, Appellant asserts that the Government improperly (1) shifted the burden of proof at trial by demanding that she prove the veracity of her billing; and (2) appealed to the jury's pecuniary interests by framing the alleged loss as directly impacting the jurors as taxpayers.

We review a claim of prosecutorial misconduct de novo to determine whether the acts complained of were in fact misconduct and, if so, whether they had the effect of depriving the defendant of a fair trial. *United States v. Rand*, 835 F.3d 451, 464–65 (4th Cir. 2016); *United States v. Chavez*, 894 F.3d 593, 602 (4th Cir. 2018). But if the issue is unpreserved, we review only for plain error. *United States v. Powell*, 680 F.3d 350, 358 (4th Cir. 2012); *United States v. Hale*, 857 F.3d 158, 173–74 (4th Cir. 2017); *United States v. Alerre*, 430 F.3d 681, 689 (4th Cir. 2005). Under that standard, misconduct will warrant a new trial only if it was plain and affected the "fairness, integrity, or public reputation of judicial proceedings." *Alerre*, 430 F.3d at 689; *Powell*, 680 F.3d at 358.

We utilize a six-factor test to determine whether the Government's remarks warrant reversal:

> (1) [T]he degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; (5) whether the prosecutor's remarks were

20

invited by improper conduct of defense counsel; and (6) whether curative instructions were given to the jury.

*Rand*, 835 F.3d at 465.

## 1.
## Burden Shifting

Appellant first argues that the Government improperly shifted the burden of proof by implying that the jury could presume any off-site work to be fraudulent, thus requiring Appellant to affirmatively prove she was working on Ironbridge during the hours in question. Appellant specifically points to a series of questions from the Government during her trial testimony and statements in its closing concerning why she had not introduced allegedly exculpatory evidence available to Appellant. *See, e.g.*, J.A. 2672 ("So who is available who can explain to this jury that you were regularly working 14 hours a day on the Ironbridge contract?"); *id.* at 3051 ("[Appellant] has access to subpoenas . . . to compel the appearance of witnesses just as we do. They can bring in anyone they want. And you can put them up there even as an adverse witness and examine them. That didn't happen."). Appellant preserved her objection to the alleged burden shifting, asserting, "suggesting that any off-site work was not permitted under the contract [is] absolutely prejudicial." *Id.* at 1870.

This issue implicates two constitutional rights. The first is the Fifth Amendment right of a defendant not to be compelled to testify. *Griffin v. California*, 380 U.S. 609, 611–12 (1965). It is black letter law that a prosecutor may not comment upon a defendant's choice not to testify lest that right be diminished. *Id.* at 613–14. Where a defendant has

chosen to testify, however, a prosecutor's comment on the plausibility of a defendant's theory of the case does not implicate the defendant's Fifth Amendment right. *United States v. Stockton*, 349 F.3d 755, 763 (4th Cir. 2003) (explaining that the Government had not violated the defendant's Fifth Amendment rights by noting in closing argument his decision not to call an allegedly exculpatory witness because both the defendant and the witness had testified).

Appellant's entitlement to a presumption of innocence is also implicated. That presumption arises from the Sixth Amendment right to an impartial jury and the Fourteenth Amendment right to due process. *Alleyne v. United States*, 570 U.S. 99, 104–05 (2013); 21A Am. Jur. 2d Crim. Law § 1174. This presumption places on the prosecution the burden of proving each element of each charged offense beyond a reasonable doubt. *Francis v. Franklin*, 471 U.S. 307, 313–15 (1985). But it does not prevent the prosecution from attacking the plausibility of the defense's theory or asking that the jury draw reasonable inferences based on record evidence. *Id.* at 314–15; *Cnty. Court of Ulster Cnty., N.Y. v. Allen*, 442 U.S. 140, 157 (1979). Most relevantly, the prosecution may question the plausibility of the defense's case by pointing out inconsistencies therein or noting that the defense has failed to produce available and allegedly exculpatory evidence. *See, e.g., Locket v. Ohio*, 438 U.S. 586, 594–95 (1978) (finding no burden shifting when the prosecution characterized its case as "unrefuted" after the defense counsel outlined its contemplated defense and indicated that defendant would testify); *Stockton*, 349 F.3d at 763 (finding no prosecutorial misconduct where the Government critiqued the plausibility

22

of the defense's case by noting that it had failed to call a witness who offered exculpatory testimony that contradicted the defendant's own version of events).

Other circuit courts have held similarly. For example, *United States v. Schmitz* is an analogous case from the Eleventh Circuit. 634 F.3d 1247 (11th Cir. 2011). Schmitz was convicted of fraudulently over-collecting salary from a government job. Schmitz testified in her own defense at trial. *Id.* at 1255–56. During closing argument, the prosecution commented on Schmitz's failure to corroborate her claim that she had done substantially all of the work for which she was paid. On appeal, the Eleventh Circuit rejected Schmitz's allegation of prosecutorial misconduct. It reasoned that Schmitz had put the credibility of her non-fraudulent explanation at issue by presenting that theory to the jury. *Id.* at 1267; *see also Moore v. Mitchell*, 708 F.3d 760, 806–07 (6th Cir. 2013) (finding no fault in a challenge to the Government's comment on the defendant's failure to call an expert witness in his defense because, although Moore did not testify, "[w]here there are witnesses other than the defendant who could have been called to refute a point made by the prosecution, it is permissible for the prosecution to comment on the defendant's failure to rebut that proof"); *Demirdjian v. Gipson*, 832 F.3d 1060, 1067 (9th Cir. 2016) (explaining that the prosecution may call attention to the defense's failure to present available, exculpatory evidence as long as the comment is not likely to be construed as a comment on the defendant's failure to testify); *United States v. Berroa*, 856 F.3d 141, 161–62 (1st Cir. 2017) (noting that the prosecution has some latitude "to comment on the plausibility of the defendant's theory," but only if the prosecution focuses "on the evidence itself and what the evidence shows or does not show, rather than on the defendant and what

23

he or she has shown or failed to show"); *United States v. Dale*, 614 F.3d 942, 961 (8th Cir. 2010) (explaining in the context of a similar challenge that "a prosecutor is entitled to make a fair response and rebuttal when the defense attacks the Government's case").

With all of this in mind, Appellant's prosecutorial misconduct claims based on burden shifting fail under our six factor test set out in *Rand*. First, the Government did not attempt to shift the burden of proof. In the cross examination questions Appellant complains of, the Government simply asked about facts and evidence that Appellant herself had put at issue, including witnesses who could allegedly attest to her remote work on Ironbridge and a personal calendar Appellant claimed would be exculpatory. And the Government's closing argument merely reiterated the fact that Appellant had not put on witnesses and evidence that she herself had claimed would help her case. Moreover, as detailed above, the district court repeatedly affirmed that the Government maintained the burden of proof. *See supra* pp. 26–28.

And in any event, the court's repeated affirmance that the burden of proof remained with the prosecution was more than sufficient to cure any alleged error. Additionally, there is an abundance of evidence establishing Appellant's guilt, minimizing the prejudicial effect of any alleged errors. *See supra* Section III.B.

Therefore, we hold that the Government did not impermissibly shift the burden of proof to Appellant.

24

2.
Pecuniary Interest

Appellant also argues that the prosecution engaged in misconduct by "appeal[ing] to the pecuniary interests of [the] jurors" during the Government's closing argument. Appellant's Opening Br. at 70. It did so, she claims, first by asking if the jurors would have employed billing practices like Appellant's, given her $150 per hour rate of pay; and second, by noting that a three day period in which Appellant billed 24 hours to Ironbridge while absent from the NSOC cost "about $3,600 in taxpayer funds." Appellant's Opening Br. at 71 (quoting J.A. 2980).

Again, Appellant did not preserve this issue because she did not object to the comments when they were made. Consequently, we review only for plain error. *United States v. Alerre*, 430 F.3d 681, 689 (4th Cir. 2005); *United States v. Powell*, 680 F.3d 350, 358 (4th Cir. 2012).

"[A]ppeals to the pecuniary interests of jurors are patently improper." *United States v. Blecker*, 657 F.2d 629, 636 (4th Cir. 1981). The Government cannot articulate the consequences of an alleged offense in terms of its burden on taxpayers. However, the comments at issue here did not run afoul of that rule. This is because both comments arose in the context of the Government's explanation of the materiality element of the fraud charges -- that is, the allegation that Appellant must have recognized the material difference between her actual work and her billed hours.

Take the first comment about which Appellant complains:

> [F]or materiality, all you need to do is . . . ask whether the
> difference between what [Appellant] claimed and what she

25

> really did was material. . . . So ask yourself, would that difference in the number of hours at about $150 an hour or about $2.50 a minute make a difference to you? That's materiality.

J.A. 2965. Rather than appealing to pecuniary interests, this statement was clearly meant to draw to the jury's attention the significance of each hour Appellant billed, given her high hourly rate of pay.

The second comment, regarding taxpayer funds, is a closer call. While summarizing the conflicts between Appellant's social calendar and her billed hours, the Government stated:

> On March 31st, [Appellant] also says she's in Charleston, South Carolina for Industry Day. That's the third straight day she's away from NSA. Each day she billed eight hours. That's about $3,600 in tax payer funds for those days.

J.A. 2980. Under a different standard of review, such a direct invocation of public funds may be reversible, and the Government would do well not to repeat this tactic. But even if the comment crossed the line, we cannot say, given the *Rand* factors and our standard of review, that it warrants reversal in this case. In short, it is far from clear that this isolated statement "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *McCabe*, 103 F.4th at 279. First, it was a single passing statement in the context of a 16 day jury trial. Second, it is unlikely that the remark had any influence on the jury's decision given the large volume of inculpatory evidence. Finally, there is no evidence that the Government used the remark to distract the jury from the merits of the case because the comment came as part of a broader discussion as to whether there was a

26

material difference between the number of hours Appellant spent working on Ironbridge and the number of hours she billed. *See Rand*, 835 F.3d at 465.

As a result, we hold that the Government's comments did not plainly deprive Appellant of her right to a fair trial.

## E.
### The District Court's Loss Calculation Was Supported by Sufficient Evidence.

Appellant challenges the district court's loss calculation for the purposes of both the sentence and restitution imposed.

Appellant argues, "the [district] court's restitution order should . . . be vacated because its loss determination was arbitrary and not supported by the evidence." Appellant's Opening Br. at 79. She further argues that the district court did not merely overestimate the amount of loss. Instead, she claims that the court clearly erred by finding that the NSA suffered *any loss at all*. She arrives at this conclusion by reasoning that the NSA paid for fewer SPM hours than the Ironbridge contract stipulated. Thus, the agency paid ITK less for that position than the contract required. She further asserts that the agency was, by all accounts, otherwise satisfied with the work it received. According to Appellant, she conferred a net benefit on the agency by overseeing effective performance at less than the contract price. And, Appellant reasons, if the court had reached her preferred loss amount -- $0.00 -- the Guidelines would have set a recommended sentencing range of 0–6 months of imprisonment, well below not only the 21–27 month range the court ultimately settled on, but also the 13 month sentence she actually received. We address Appellant's restitution and sentencing arguments in turn.

27

We review the district court's calculation of the loss amount for clear error. *United States v. Booker*, 146 F.4th 332, 347 (4th Cir. 2025). "A district court clearly errs when, 'although there is evidence to support [the factual finding], the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *Walsh v. Vinoskey*, 19 F.4th 672, 677 (4th Cir. 2021)). Relatedly, district courts have discretion to determine the best means of calculating the amount of restitution. *United States v. Steele*, 897 F.3d 606, 609–11 (4th Cir. 2018).

1.
Restitution

"[W]hen sentencing a defendant convicted of [a federal property crime involving fraud], the court shall order, in addition to . . . any other penalty authorized by law, that the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1) & (c)(1)(ii). "[T]he court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." *Id.* § 3664(f)(1)(A). "The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." *Id.* § 3664(e); *see also United States v. Boutcher*, 998 F.3d 603, 610 (4th Cir. 2021) ("Any order of restitution made under [§ 3663A] must be issued in accordance with [§ 3664], which establishes procedures for calculating restitution amounts.").

Appellant's restitution arguments are without merit. "Fraud is one of the principal grounds for restitution and one of the principal sources of unjust enrichment." Restatement

28

(Third) of Restitution & Unjust Enrichment § 13 & Cmt. a. The Ironbridge contract stated plainly that ITK could bill only for "effort in direct support of the contract," not for "travel, lunch, or work performed at any employee's residence or other non-work locations or other effort which does not have a specific and direct contribution to tasks described" in the contract. J.A. 7079. A jury convicted Appellant of billing more time to the contract than she had actually spent working on it. That is textbook fraud.

The district court considered at length the factual basis for its restitution calculation. The court's most consequential finding was its estimation of the number of billed, remote hours Appellant could fairly be estimated to have actually worked on Ironbridge. The court ultimately decided to credit Appellant for an average of 15 hours per week. After deducting those hours from her total billed time, the court thus settled on a final loss amount of $176,913 -- well below the Government's proffered loss amount of $306,186. The court found it "inconceivable" that Appellant warranted more credit, given the limitations of her role as the SPM. J.A.7098. It also found that estimation "eminently fair to [Appellant,] possibly not fair to the Government" because there is no way to firmly establish how much of Appellant's remote work was legitimate given the scarce contact she kept with NSA and ITK personnel. J.A. 7098.

29

Given the difficulty of calculating the exact number of hours Appellant worked and the fact that the district court leaned in Appellant's favor,[4] we discern no abuse of discretion in the court's calculation.

2.

Sentence

For crimes involving losses exceeding $6,500, the Guidelines impose an offense level increase corresponding to the amount of loss. *See* U.S.S.G. § 2B1.1(b). Appellant challenges her sentence to the extent that it was based, in part, on what she alleges to be an erroneous loss calculation. Having already determined that the district court did not abuse its discretion in calculating the loss amount, we hold that this claim likewise lacks merit.

III.

For the foregoing reasons, the judgment is

*AFFIRMED*.

---

[4] The Government did not cross appeal the reasonableness of the district court's findings.